460 July 16, 2015 No. 26

IN THE SUPREME COURT OF THE
STATE OF OREGON

Marquis COUEY,
an individual,
*Petitioner on Review,*

*v.*

Jeanne ATKINS,
in her official capacity as
Secretary of State of Oregon,
*Respondent on Review.*

(CC 10C14484; CA A148473; SC S061650)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 24, 2014.

Daniel W. Meek, Portland, argued the cause for petitioner on review. Linda K. Williams, Portland, filed the briefs.

Rolf Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the briefs were Ellen F. Rosenblum, Attorney General, Anna Joyce, Solicitor General, and Michael S. Shin, Assistant Attorney General.

Alan J. Galloway, Davis Wright Tremaine LLP, Portland, argued the cause and filed the brief for *amicus curiae* American Civil Liberties Union of Oregon, Inc. With him on the brief were Timothy R. Volpert and Kevin Díaz.

Robert M. Atkinson, Portland, filed the brief for himself as *amicus curiae*.

LANDAU, J.

The decision of the Court of Appeals and the judgment of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.

_____

* Appeal from Marion County Circuit Court, Claudia M. Burton, Judge. 257 Or App 434, 306 P3d 778 (2013).

**LANDAU, J.**

ORS 250.048(9)[1] provides that a person who is registered with the Secretary of State to collect initiative petition signatures for pay may not, "at the same time, obtain signatures on a petition or prospective petition for which the person is not being paid." Plaintiff initiated this action against the Secretary of State, challenging the constitutionality of that statute. At the time he initiated the action, he had registered to collect initiative petition signatures for pay and had been hired to do just that. At the same time, he wanted to collect signatures on other measures on a volunteer basis. He contended that ORS 250.048(9) violated his constitutional rights of freedom of expression and association.

During the pendency of the litigation, however, plaintiff stopped working as a paid signature collector, and his registration expired. The secretary moved for summary judgment on the ground that the action had become moot. Plaintiff opposed the motion, submitting an affidavit stating that he intended to work as a paid signature collector in the future and that he might be interested in collecting signatures on a volunteer basis on other measures at the same time. He also argued that, even if his action had become moot, the action nevertheless should proceed because it is "likely to evade judicial review in the future," and ORS 14.175 expressly authorizes courts to adjudicate such cases.

The trial court entered summary judgment dismissing the action on the ground that the action had become moot. The court concluded that, because plaintiff had failed to ask for expedited consideration, his is not the sort of case that is likely to evade review under ORS 14.175. The Court of Appeals affirmed, and we accepted plaintiff's petition for review.

On review, the case presents the following issues for us to resolve: (1) whether the averments in plaintiff's affidavit are sufficient to establish that his action is not moot; (2) even if the action is moot, whether it is nevertheless justiciable under ORS 14.175 because it is likely to evade review

---

[1] In 2013, the statute was renumbered as ORS 250.048(10). Or Laws 2013, ch 519, § 1. Throughout this opinion, we refer to the version of the statute that was in effect at the time of the filing of the action.

within the meaning of that statute; and (3) if it is subject to ORS 14.175, whether the legislature possessed the constitutional authority to enact it. The case thus requires us to examine the subject of justiciability—in terms of this court's own jurisprudence on the rule against deciding moot cases, the intended meaning of the statutory exception to that rule, and the legislature's constitutional authority to enact such a law. It does not require us to reach the merits.

For the reasons that follow, we conclude that: (1) plaintiff's affidavit is insufficient to establish that his action is not moot; (2) the action nevertheless is likely to evade judicial review under the standard set out in ORS 14.175, because it is not necessary to request expedited consideration to meet its terms; and (3) the legislature does possess the constitutional authority to enact the statute. Accordingly, because we conclude that the case is justiciable under ORS 14.175, we reverse the decision of the Court of Appeals, reverse the decision of the trial court, and remand for further proceedings.

## I.  BACKGROUND

### A.  *Regulatory context*

We begin with a brief summary of the regulation of the initiative petition signature collection process to provide context for our discussion of the relevant facts. The powers of initiative and referendum reserved by the people in Article IV, section 1, of the Oregon Constitution allow them to enact statutes, adopt or reject bills passed by the legislature, and adopt amendments to the state constitution. The parties who seek to place a statewide initiative measure on an election ballot, known as the chief petitioners, must submit to the Secretary of State the text of the proposed measure along with the required number of sponsorship signatures. *See* ORS 250.045(1) (requiring filing of text of prospective petition with signatures of at least 1,000 electors). There follows the certification of a ballot title, an impartial summary of the proposed measure. ORS 250.065 - 250.085. Once the ballot title has been certified, the chief petitioners are responsible for collecting signatures from registered voters who support placing the measure on an upcoming election ballot. Depending on whether the measure proposes

to enact a statute or to adopt a constitutional amendment, the number of required signatures varies from six to eight percent of the total votes cast for governor at the last election. Or Const, Art IV, § 1(2)(b), (c). Chief petitioners have a limited time to collect those signatures, which must be submitted to the Secretary of State at least four months before the date of the next regularly scheduled general election. Or Const, Art IV, § 1(2)(e).

The process of collecting initiative petition signatures is regulated by statute and by administrative rules promulgated by the Secretary of State. Chief petitioners are authorized to hire paid signature collectors. ORS 250.045(2). But they must notify the Secretary of State of their intention to do that, and the petition itself must include a statement that one or more persons is being paid to collect signatures. ORS 250.045(2), (7).

Before a person may be paid to collect initiative petition signatures, he or she must register with the Secretary of State, specify for which measures signatures will be collected, and complete a training program prescribed by rule by the secretary. ORS 250.048(1), (2). That registration remains in effect for a limited time; it expires four months before the next general election, when initiative petition signatures are due. ORS 250.048(3).

A registered paid initiative petition signature collector may not collect signatures on other measures on a volunteer basis. ORS 250.048(9) provides: "A person registered under this section [to be a paid collector] may not obtain signatures on a petition or prospective petition for which the person is being paid and, at the same time, obtain signatures on a petition or prospective petition for which the person is not being paid." The statute further provides that the Secretary of State may not count any signatures that were collected in violation of that restriction. *Id*.

B.   *Facts*

The relevant facts are few and undisputed. We review them in the light most favorable to plaintiff. ORCP 47 C; *Towe v. Sacagawea, Inc.*, 357 Or 74, 77 n 2, 347 P3d 766 (2015) (on review of summary judgment, evidence is viewed in light most favorable to nonmoving party).

Plaintiff obtained registration to work as a paid signature collector for Initiative Petitions 28 and 70 during the 2010 election cycle, scheduled to end July 2, 2010. He performed that work in the "winter and early spring" of 2010. During that time, he became interested in collecting signatures for a third measure, Initiative Petition 42, but on a volunteer basis. He explained that he was interested in the subject of that measure—environmental protection—and that he was often at events "where I met people when I was not being paid as a petitioner, and I could have easily gotten signatures at those times." But he was concerned that ORS 250.048(9) did not seem to permit him to do that.

On April 19, 2010, plaintiff initiated this action against the Secretary of State challenging the constitutionality of ORS 250.048(9). He alleged as the basis for the action the Declaratory Judgments Act, ORS 28.020, and a separate statute providing for challenges to actions of the Secretary of State, ORS 246.910. He asked for a declaration that ORS 250.048(9) is unconstitutionally overbroad, in violation of his rights of free expression and free association guaranteed under Article I, sections 8 and 27, of the Oregon Constitution, and under the First and Fourteenth Amendments to the United States Constitution. He alleged that his uncertainty about the meaning of ORS 250.048(9)—in particular, what the statute means when it prohibits collecting signatures as a paid collector and a volunteer "at the same time"—effectively chills his rights of free expression and free association. He also sought nominal damages and an injunction to prohibit the secretary from enforcing the challenged law.

A few weeks later, plaintiff stopped working as an initiative petition signature collector; he took on a new restaurant server job and wanted to focus on that new opportunity. Later that month, however, plaintiff was injured in an automobile accident and became unable to work at all for the next several months.

On July 2, 2010, the deadline for submitting initiative petition signatures arrived, and with it came the expiration of plaintiff's registration as a paid signature collector. Several months later, plaintiff received a telephone

call from the Secretary of State's office to report that the secretary intended to publish a proposed rule interpreting ORS 250.048(9). Shortly thereafter, plaintiff filed an amended complaint alleging that "[a]ny rule adopted by [the Secretary of State] will continue to violate plaintiff's rights to obtain signatures as a volunteer on other petitions."[2]

The secretary moved for summary judgment on the ground that plaintiff's claims had become moot. The secretary argued that plaintiff was no longer a registered paid initiative petition signature collector and thus "no longer has a sufficient and present interest in the resolution of this controversy." Any remaining interest in the constitutionality of ORS 250.048(9), the secretary argued, is too speculative to support the continuing justiciability of the action under either ORS 28.020 or ORS 246.910.

Plaintiff opposed the secretary's motion, arguing that the action had not become moot. In the alternative, he argued that, if moot, the action remains justiciable under ORS 14.175, which authorizes courts to hear moot cases that are capable of repetition, yet evading review. In support of his contention that the action had not yet become moot, plaintiff submitted an affidavit, in which he averred that he had recently registered as a paid initiative petition signature collector for the 2012 election cycle, and stated that "I fully intend to work *** as a paid circulator in the future." He also stated that "[w]hen another measure dealing with protecting the environment starts to circulate, I'd like to support it." He said that "I might be willing to have a volunteer signature while being on hours, as well, but the

---

[2] The secretary ultimately adopted the rule in November 2011. OAR 165-014-0285. That rule provides:

"Under ORS 250.048(9), a person may not obtain signatures on a petition or prospective petition for which the person is being paid and, at the same time, obtain signatures on a petition or prospective petition for which the person is not being paid. For purposes of ORS 250.048(9), 'at the same time' means during any time period for which the person is being paid to circulate any petition or prospective petition. 'At the same time' does not include any lunch or other break period for which a person is not paid to circulate any such petition, as reflected in the person's payroll records required to be submitted under OAR 165-014-0100."

*Id.* Plaintiff did not amend his complaint following the adoption of that rule to challenge the validity of that rule.

main agenda is to be able to collect signatures on a volunteer basis outside of my work hours." According to plaintiff, "I would like to have the right and freedom to collect signatures on a volunteer basis during my work hours." Plaintiff also submitted an affidavit of a chief petitioner on Initiative Petition 42 (2010), who stated that "we intend to try to circulate another petition" in the coming year.

The trial court granted the secretary's summary judgment motion and dismissed the action. The court explained that, although plaintiff had standing to initiate the action, the case had become moot:

> "The 2010 election is over and plaintiff no longer seeks relief regarding anything that occurred in that election; he only seeks prospective relief. *** [A]lthough he has taken steps to become registered as a paid petition circulator, there is no evidence that there is any petition which he wishes to circulate as a volunteer, or that his prospective employer for paid petition circulation will permit him to circulate a volunteer petition 'at the same time' (as defined by the rule) as he is circulating a paid petition."

The court further concluded that plaintiff was not entitled to pursue the action under ORS 14.175. The court explained that plaintiff had failed to demonstrate that the matter was likely to evade judicial review. The court acknowledged that the ordinary election cycle generally would not provide sufficient time to resolve actions such as the one before it. Nevertheless, the court concluded, plaintiff had failed to request expedited review, which—if granted—might have prevented the case from becoming moot.

Plaintiff appealed, and the Court of Appeals affirmed. *Couey v. Brown*, 257 Or App 434, 306 P3d 778 (2013). The court first concluded that the case was indeed moot, as there was no evidence in the record of a measure for which plaintiff wanted to collect initiative petition signatures on a volunteer basis. *Id.* at 443. The court then concluded that the case was not subject to the statutory mootness exception enacted in ORS 14.175. *Id.* at 444. Like the trial court, the Court of Appeals acknowledged that, "it is true that cases typically take more than two years to move from filing to issuance of an appellate judgment, especially cases that go

to the Supreme Court." *Id*. But, also like the trial court, the Court of Appeals concluded that plaintiff could have requested expedited consideration of his action, yet failed to do so. The court noted "the obvious question of whether [the] statute [ORS 14.175] violates the Oregon Constitution" under *Yancy v. Shatzer*, 337 Or 345, 363, 97 P3d 1161 (2004), in which this court held "in no uncertain terms" that the judicial power under the Oregon Constitution does not extend to moot cases that are capable of repetition, yet evading review. *Couey*, 257 Or App at 445 n 1. Because the court ultimately concluded that plaintiff did not qualify for review under that statute, it did not need to reach that issue. *Id*.

## II.   ANALYSIS

A.   *Is plaintiff's action moot?*

On review, plaintiff argues that the Court of Appeals erred in concluding that his action is now moot. He contends that the court erred in concluding that the declaratory judgment portion of the action is moot for essentially two reasons. First, he argues that the affidavits that he submitted in opposition to the secretary's summary judgment motion adequately evince a concrete interest in the outcome of the case. Second, he argues that, even if that is not the case, the fact that he has brought claims for unconstitutional overbreadth effectively excuses him from having to establish the continuing justiciability of his claims. As for the remaining portion of the action that arises under ORS 246.910—pertaining to judicial review of actions of the Secretary of State—plaintiff argues that the court erred in affirming the dismissal of that claim as well. We address each of those three arguments in turn.

1.   *The action for a declaratory judgment*

Plaintiff's initial argument that the declaratory judgment portion of his action is not moot is brief and a bit cryptic. He devotes most of his efforts to his argument that the overbreath doctrine effectively relaxes justiciability requirements. As to the sufficiency of his affidavit, he argues that, under Oregon law, "there is no case law rule that 'hypothetical' injury renders claims for declaratory relief [*per se*] nonjusticiable merely because the injury has not actually yet

occurred." Citing *Pendleton School Dist. v. State of Oregon*, 345 Or 596, 200 P3d 133 (2009), he argues that, if a dispute involves the interpretation of an existing statute "that could apply to a party in the future," that is sufficient to create a justiciable controversy. In plaintiff's view, his affidavit establishes "the likelihood that he and others suffer continuing chill of political speech, satisfying any personal stake" requirement the law may impose. Beyond those bare conclusions, plaintiff does not explain what in his affidavit establishes that likelihood or how it otherwise demonstrates that the action is not moot.

The secretary responds that, at the time of her summary judgment motion, there was no actual controversy based on present facts, as the law requires. At that time, plaintiff had stopped working as a paid initiative petition collector. He had registered to work on a measure in February 2011, but nothing in the record suggests that he actually performed that work. In addition, nothing in the record showed that there were any then-existing measures for which he was presently interested in collecting signatures on a volunteer basis. Accordingly, the secretary argues, at that point petitioner was not doing anything that ORS 250.048(9) prohibited. Nor does the record show that the challenged statute was actually preventing him from taking any action.

We agree with the Secretary of State. To maintain a declaratory judgment action, a plaintiff must establish at the outset that he or she satisfies the statutory requirements for standing to bring the action. *Morgan v. Sisters School District # 6*, 353 Or 189, 195, 301 P3d 419 (2013). Thereafter, the plaintiff's concrete stake in the outcome must continue throughout the pendency of the case. *Savage v. Munn*, 317 Or 283, 291-92, 856 P2d 298 (1993). If, after the initiation of the action, it becomes moot, it will be dismissed for want of justiciability.[3] *Barcik v. Kubiaczyk*, 321 Or 174, 188, 895 P2d 765 (1995). In this case, there is no dispute that, at least at the time plaintiff initiated this action, he satisfied the

___

[3] As we explain later in this opinion, this court's prior cases have not been consistent about whether dismissal on mootness grounds is required as a matter of constitutional law or is instead a product of justiciability doctrine that the court has developed as matter of judicial discretion.

standing requirements of the Declaratory Judgments Act. The issue is whether, with the passing of certain events, the action became moot.

As this court explained in *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993), "[d]etermining mootness is one part of the broader question of whether a justiciable controversy exists." In the context of a declaratory judgment action, a justiciable controversy requires "a dispute based on present facts," not facts that may or may not happen in the future. *TVKO v. Howland*, 335 Or 527, 534, 73 P3d 905 (2003); *see also Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982) ("To be justiciable, a controversy must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue."). Thus, plaintiff is incorrect in stating that "there is no case law rule that 'hypothetical injury' renders claims for declaratory relief [*per se*] nonjusticiable." To the contrary, a justiciable controversy is, by very definition, one that is not hypothetical. Declaratory relief is available "only when it can affect *in the present* some rights between the parties." *Barcik*, 321 Or at 188 (emphasis in original).

This court's decision in *Pendleton* is not to the contrary. In that case, 18 school districts brought an action for a declaration that Article III, section 8, of the Oregon Constitution requires the legislature to fund the Oregon public school system at a level sufficient to meet certain quality standards. They alleged that the legislature had failed to comply with that obligation during the 2005-07 biennium. They further alleged that they continued to suffer present harm as a result of that past failure and that the legislature has an ongoing constitutional obligation to fund schools to meet quality standards. 345 Or at 601. In that context, this court explained, the fact that the 2005-07 biennium had passed did not render the controversy moot: The issue remained "whether Article VIII, section 8, imposes a duty on the legislature to fund the public school system at a specified level every biennium." *Id*. at 606. Whether the legislature operates under such a continuing obligation, the court explained, "presents a set of present facts regarding the interpretation of a constitutional provision." *Id*.

In this case, the only "present facts" established in the record are that, at the time of the summary judgment, plaintiff's registration to circulate petitions during the 2010 election had expired; that he had recently registered with the Secretary of State to collect signatures on a paid basis during 2012; that he "fully intended" to work as a paid signature collector "in the future"; and that, "[w]hen another measure dealing with protecting the environment starts to circulate, I'd like to support it." There is no evidence that, at that time, plaintiff was actually employed as a paid initiative petition signature collector. More importantly, there is no evidence that there existed "another measure dealing with protecting the environment." There was evidence that the chief petitioner of the earlier measure that plaintiff wanted to support intended to "try to circulate another petition," but there is no evidence that the chief petitioner ever took steps to make that happen, much less that such a measure reached the stage of signature collection.[4] Giving plaintiff every beneficial inference, the best that the evidence shows is that, *if* plaintiff obtained employment as a signature collector, and *if* another measure dealing with protecting the environment were filed, and *if* that measure garnered the requisite number of sponsors, and *if* that measure obtained a certified ballot title, *then* plaintiff "would like to support it," presumably by collecting petition signatures on a volunteer basis.

That is the epitome of contingent and speculative facts. There is no evidence that plaintiff is currently harmed, or even under current threat of harm, by ORS 250.048(9). Any suggestion of possible harm is a matter of no more than speculation, depending entirely on a series of assumptions unsupported by any evidence in the record. The trial court and the Court of Appeals correctly concluded that plaintiff's affidavit was insufficient to establish that his declaratory judgment action had not become moot.

2. *The effect of the overbreadth claim*

In the alternative, plaintiff argues that, even if his declaratory judgment action is otherwise moot, the fact that

_____

[4] In fact, according to the Secretary of State's records of initiative and referendum petitions, no such petition was filed during the 2012 election cycle.

his claims are based on the asserted unconstitutional over-breadth of ORS 250.048(9) excuses him from satisfying any requirement that the claim be justiciable. In plaintiff's view, "overbreadth" is a doctrine of substantive First Amendment law that this court has adopted in free expression cases. Under that doctrine, he contends, a plaintiff may claim that a challenged law violates his or her own constitutional rights or that the law hypothetically could violate the rights of others. Necessarily, he argues, the doctrine carves out an exception to any justiciability constraints that otherwise apply.

The secretary argues that plaintiff misapprehends overbreadth analysis. In the secretary's view, although an overbreadth claim can extend beyond the rights of specific plaintiffs, even the federal law on which plaintiff in this case relies holds that such a claim can be asserted in the first instance only by one with a personal stake in its resolution.

Again, we agree with the Secretary of State. A party challenging the constitutionality of a statute may contend that the law is unconstitutional in all possible applications—that is, it is unconstitutional on its face. *E.g.*, *State v. Hirsch/Friend*, 338 Or 622, 627, 114 P3d 1104 (2005) ("[W]hen bringing certain facial challenges to a statute, the challenger ordinarily must establish that the statute is unconstitutional in all its applications."). Or the law may be challenged on the ground that it is unconstitutional as applied to a particular individual on a particular set of facts. *E.g.*, *State v. Rodriguez/Buck*, 347 Or 46, 78-79, 217 P3d 659 (2009) (75-month mandatory sentence, although not facially unconstitutional, held unconstitutional as applied to the facts of that case).

In cases involving regulation of free expression, the United States Supreme Court has developed an exception to the ordinary rule that a facial challenge requires a demonstration that the challenged law is unconstitutional in all possible applications. *Virginia v. Hicks*, 539 US 113, 118, 123 S Ct 2191, 156 L Ed 2d 148 (2003). Instead, because of the special significance of rights of free expression, the Court has held that a law regulating free expression may be unconstitutionally "overbroad" if it prohibits any

"substantial amount" of constitutionally protected conduct. *Id.* at 118-19.[5] Moreover, a defendant to whom a challenged statute applies may assert that the law is unconstitutionally overbroad even if he or she has not engaged in the constitutionally protected conduct. *City Council v. Taxpayers for Vincent*, 466 US 789, 798, 104 S Ct 2118, 80 L Ed 2d 772 (1984). In effect, the overbreadth doctrine thus permits a party to whom a statute constitutionally applies to argue that the statute nevertheless is unconstitutional because it would violate the rights of others. *Broadrick v. Oklahoma*, 413 US 601, 612, 93 S Ct 2908, 37 L Ed 2d 830 (1973). The Supreme Court has explained this exception to the prudential rule against parties asserting the rights of others by noting the importance of avoiding the "chilling effect" of an overbroad law:

> "We have provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions. Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of the uninhibited marketplace of ideas."

*Hicks*, 539 US at 119.

It is important to note, however, that although the law may authorize a party to assert the rights of others, that does not mean that the party is excused from demonstrating his or her own standing to bring the claim. Only a person to whom the statute applies, even if constitutionally, may assert an overbreadth challenge. That is to say, overbreadth may represent a loosening of the ordinary prudential rule that parties cannot assert the rights of others, but it does not represent a loosening of the federal constitutional requirement that the party asserting the law's overbreadth have standing and that the party's interest continue throughout the proceeding. *See generally* Laurence H. Tribe, *American*

---

[5] Oregon cases use slightly different phrasing, referring to whether the challenged law "reaches privileged communication" and "does so more than rarely." *See, e.g.*, *State v. Rangel*, 328 Or 294, 299-300, 977 P2d 379 (1999).

*Constitutional Law* § 12-27, 1024 (2d ed 1988) ("[O]ver-breadth does not in fact possess a distinctive standing component."); Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale LJ 853, 869 (1991) (An overbreadth claim is consistent with justiciability requirements of Article III because it is asserted by "[a] party who is charged with violating a statute or threatened with imminent prosecution" under it.).

In *Virginia v. American Booksellers Assn.*, 484 US 383, 108 S Ct 636, 98 L Ed 2d 782 (1988), for instance, the plaintiff challenged as unconstitutionally overbroad a state law prohibiting the display of visual or written materials to juveniles depicting, among other things, sexual conduct. The Court's analysis of the justiciability of the action proceeded in two distinct steps. First, the Court addressed whether the plaintiff had satisfied the "irreducible minimum" constitutional requirement of personal injury. *Id.* at 392. That is, the Court explained, the plaintiff must show "threatened or actual injury" resulting from the application of the challenged statute. *Id.* Second, the Court said that, once the constitutional standing requirement has been satisfied, it is appropriate to address whether the plaintiff could advance the particular argument, that is, overbreadth. *Id.* The Court noted that "the usual rule is that a party may assert only a violation of its own rights." *Id.* But, the Court said, in the case of overbreadth challenges arising under the First Amendment, there is an exception to that prudential rule. *Id.* at 392-93.

Similarly, in *Bigelow v. Virginia*, 421 US 809, 816-17, 95 S Ct 2222, 44 L Ed 2d 600 (1975), the Court held that, to assert a claim of overbreadth, a party must have standing, and "in order to have standing, an individual must present more than 'allegations of a subjective chill.' There must be a claim of specific present objective harm or a threat of specific future harm" arising from the application of the challenged statute to the person challenging it. *See also Hedges v. Obama*, 724 F3d 170, 204 (2d Cir 2013) (overbreadth doctrine "[r]elax[es] the general prudential rule against third-party standing" but "does not provide a reason to *** find injury where none is present or imminently threatened in the first instance"); *Cole v. Oroville Union High School District*, 228 F3d 1092, 1099 (9th Cir 2000) ("[A] litigant

cannot sustain an overbreadth or *jus tertii* claim if he no longer has a personal interest in the outcome which itself satisfies the case or controversy requirement."). A plaintiff's concrete interest in the outcome of the litigation must continue throughout the prosecution of his or her overbreadth claim; if events occur that eliminate that personal interest, the overbreadth claim becomes moot and will be dismissed for want of justiciability. *Bigelow*, 421 US at 817-18.

This court has borrowed federal court overbreadth doctrine. *State v. Robertson*, 293 Or 402, 410, 649 P2d 569 (1982). And it continues to refer to federal case law for its own explanation of the justification and contours of the doctrine. *State v. Christian*, 354 Or 22, 40, 307 P3d 429 (2013).[6] In light of that case law, we reject plaintiff's contention that the fact that he asserts an overbreadth claim excuses him from establishing the justiciability of that claim.

3. *ORS 246.910*

Plaintiff's final argument regarding the mootness of his action is that, even if the declaratory judgment portion of the action is moot, the remaining action for judicial review of actions of the Secretary of State under ORS 246.910(1) is not. That statute provides:

> "A person adversely affected by any act or failure to act by the Secretary of State * * * under any election law, or by any order, rule, directive or instruction made by the Secretary of State * * * may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive, or instruction was made."

Thus, the statute provides for judicial review of an act, or failure to act, of the Secretary of State under the election laws of the state. *See generally League of Oregon Cities v. State*

---

[6] The court has never explained the source of overbreadth analysis under the Oregon Constitution. As we have noted, the United States Supreme Court has justified the doctrine by reference to the particular importance of constitutional rights of free expression. And this court, like the United States Supreme Court, has limited the application of overbreadth analysis to free speech cases. *Christian*, 354 Or at 40. But, at the same time, this court has disclaimed any interest in recognizing a hierarchy of constitutional rights. *See, e.g.*, *Libertarian Party of Oregon v. Roberts*, 305 Or 238, 246, 750 P2d 1147 (1988) (rejecting balancing of relative importance of different constitutional rights). Because our disposition of this case does not involve the merits of plaintiff's claims, we need not address that issue.

*of Oregon*, 334 Or 645, 655, 56 P3d 892 (2002) (explaining requirements of statute). In this case, plaintiff's complaint does not target any act, or failure to act, of the secretary. Rather, its sole target is the constitutionality of the election law itself, because the law itself "chills" his rights of free expression and association.[7]

Moreover, ORS 246.910 provides for such judicial review only if a person has been "adversely affected" by such an act or omission of the secretary. In this case, as we have noted, nothing in the record suggests that plaintiff is affected, much less adversely affected, by the operation of the challenged statute, ORS 250.048(9). We reject plaintiff's contention that his action is justiciable under ORS 246.910 without further discussion.

B. *If moot, is plaintiff's action nevertheless justiciable under ORS 14.175?*

Plaintiff argues that, if we conclude that his action is moot, it is nevertheless justiciable under ORS 14.175. That statute provides:

"In any action in which a party alleges that an act, policy or practice of a public body *** is unconstitutional or is otherwise contrary to law, the party may continue to prosecute the action and the court may issue a judgment on the validity of the challenged act, policy or practice even though the specific act, policy or practice giving rise to the action no longer has a practical effect on the party if the court determines that:

---

[7] As we noted above, plaintiff's amended complaint did mention the fact that the secretary, at that time, had announced her intention to propose a rule implementing ORS 250.048(9). And it further alleged that "[a]ny rule adopted by [the Secretary of State] will continue to violate plaintiff's rights to obtain signatures as a volunteer on other petitions." But, as of the time of the filing of that amended complaint, the secretary had not yet done so. As a result, plaintiff's amended complaint purported to challenge the lawfulness of a rule that had not yet been adopted. Any such claim is classically unripe and thus not justiciable. As this court explained in *Oregon Cry. Mfgs. Ass'n v. White*, 159 Or 99, 110, 78 P2d 572 (1938), "We agree that plaintiffs are not obliged to wait until the [d]irector undertakes to enforce some rule or regulation to their damage. We cannot, however, concur in the view that there is reasonable ground for complaint before any rules or regulations have been promulgated." *See also Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 392 n 24, 213 P3d 1164 (2009) (challenge to "a *possible* interpretation of the Act by the Commission *** was not ripe for review" (emphasis in original)); *Tillamook Co. v. State Board of Forestry*, 302 Or 404, 412, 730 P2d 1214 (1986) ("Challenges to future legislative amendments are not justiciable.").

"(1)  The party had standing to commence the action;

"(2)  The act challenged by the party is capable of repetition, or the policy or practice challenged by the party continues in effect; and

"(3)  The challenged policy or practice, or similar acts, are likely to evade judicial review in the future."

Thus, ORS 14.175 provides that, if a judgment in a case "no longer has a practical effect on the party" who initiated it—that is, if a case has become moot—the court is nevertheless authorized to issue such a judgment if the party can meet each of the three stated requirements. In this case, the parties agree that plaintiff satisfied the first two requirements of the statute. They dispute whether he satisfied the third, that is, that the challenged policy or practice is "likely to evade judicial review in the future."

Plaintiff contends that ORS 14.175 requires only that it is "likely" that such challenges as the one that he has initiated will evade review in the future. Election law challenges, he contends, are not likely to be adjudicated to final judgment within the short, two-year election cycle that the law provides. Indeed, plaintiff notes that in this case, the time between the date the law went into effect and the end of the election cycle was even shorter: six months. Under the circumstances, it was extremely unlikely that his claim would not evade review. Plaintiff observes that ORS 14.175 adopts the "capable of repetition, yet evading review" exception to the rule against deciding moot cases, which federal courts have embraced for many years. Because of that borrowing, he argues, federal cases are especially relevant. And those federal cases make clear that election cases such as this one are precisely the sort of cases that come within the exception.

The Secretary of State insists that two years is adequate time to resolve claims such as plaintiff's. According to the secretary, plaintiffs advancing such claims may take advantage of statutory opportunities to request expedited consideration or certification directly to this court. *See* ORS 246.910(4) ("The circuit courts and the Court of Appeals, in their discretion, may give precedence on their dockets

to appeals under this section as the circumstances may require."); ORS 19.405(1) ("When the Court of Appeals has jurisdiction of an appeal, the court, through the Chief Judge *** may certify the appeal to the Supreme Court in lieu of disposition by the Court of Appeals."). The secretary notes that, in at least two reported cases, *Crumpton v. Roberts*, 310 Or 381, 798 P2d 1100 (1990), and *Ecumenical Ministries v. Paulus*, 298 Or 62, 688 P2d 1339 (1984), that is precisely what the parties did, and the courts brought the matters to completion within two years. Furthermore, the secretary argues, the remedy of mandamus is available in election cases.

This time, we agree with plaintiff. Whether such challenges as plaintiff's are "likely to evade judicial review" is a question of statutory construction, which we examine by applying familiar principles set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 170-73, 206 P3d 1042 (2009). We review the text of the statute, in context, along with any relevant legislative history and settled rules of construction.

ORS 14.175 applies when it is "likely" that challenges such as the one before the court will evade review in the future. The term is undefined in the statute. Under the circumstances, we assume that the legislature intended the term to convey its ordinary meaning. *See State v. Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015) ("When the legislature does not provide a definition of a statutory term, we ordinarily look to the plain meaning of the statute's text."). If the undefined term is not a term of art, we ordinarily begin with its dictionary definition. *Jenkins v. Board of Parole*, 356 Or 186, 194, 335 P3d 828 (2014) ("Because the legislature has not expressly defined the words in the disputed phrase, dictionary definitions *** can be useful.").

The ordinary meaning of the adjective "likely" is "of such a nature or so circumstanced as to make something probable." *Webster's Third New Int'l Dictionary* 1310 (unabridged ed 2002); *see also The American Heritage Dictionary of the English Language* 1017 (5th ed 2011) (defining adjective "likely" as "possessing or displaying the

qualities or characteristics that make something proba-
ble: *They are likely to become angry with him.*"). The word
"probable," in turn, is defined as something "that is based
on or arises from adequate fairly convincing * * * evidence
or support." *Webster's* at 1806; *see also American Heritage
Dictionary* at 1403 (defining "probable" as "likely to happen
or be true").

Thus, on the bare face of things, it appears that the
statute applies when it is probable that a similar challenge
will evade judicial review in the future. Certainty is not
required. Nothing in the context of the statute suggests a
contrary meaning.

The legislative history of ORS 14.175 reveals that
it was enacted in direct response to a decision of this court,
*Yancy*, 337 Or at 363, in which this court held that "judicial
power under the Oregon Constitution does not extend to moot
cases that are 'capable of repetition, yet evading review.'"
The legislature was aware of the doctrine developed by fed-
eral courts that, notwithstanding the rule against deciding
moot cases, courts have authority to decide cases that are
capable of repetition and yet evade review. The legislature
adopted what is now ORS 14.175 to provide Oregon courts
that authority. As the staff measure summary for the bill
that was ultimately enacted as ORS 14.175 explains:

> "The federal courts, as well as every state in the union, rec-
> ognize an exception to the mootness doctrine for controver-
> sies that come up repeatedly, but would never be reviewed
> by appellate courts if a strict mootness standard were to
> apply. * * * Courts call this the 'capable of repetition, but
> evading review' doctrine. In *Yancy v. Shatzer*, however,
> the Oregon Supreme Court ruled that the judicial power
> granted by Article VII, sec. 1, of the Oregon Constitution
> does not include the power to hear cases that are capable
> of repetition but might evade review. Two years later, the
> Court decided *Kellas v. Department of Corrections*, in which
> it ruled that the legislature has the power to grant stand-
> ing to a party to initiate litigation even if that person might
> not have a personal interest in the litigation. HB 2324 is
> a response to the *Yancy* and *Kellas* opinions. It would pro-
> vide that, if a party already has standing to initiate a law-
> suit (*i.e.*, the bill would not give individuals new rights to

*initiate* litigation), and the action became moot while the lawsuit was pending, the party still has an interest in the litigation and the court could issue a judgment if the controversy was capable of repetition but might evade judicial review if not decided."

House Judiciary Committee Staff Measure Summary, House Bill (HB) 2324 A, Apr 25, 2007 (citations omitted; emphasis in original); *see also* Tape Recording, House Judiciary Committee, HB 2324, Apr 19, 2007 (statement of Charlie Hinkle) (explaining capable of repetition exception developed by federal courts and adopted by courts in 49 states).

The legislature thus borrowed and codified a judicially created doctrine, much as it often borrows legislation from other jurisdictions. When the legislature borrows legislation from another jurisdiction, we generally assume that, in the process, the legislature also borrows existing controlling case law interpreting that legislation. *Lindell v. Kalugin*, 353 Or 338, 355, 297 P3d 1266 (2013). It stands to reason that, when the legislature borrows the case law doctrine itself, that case law is highly persuasive evidence of the legislature's intentions. *Hatley v. Stafford*, 284 Or 523, 526 n 1, 588 P2d 603 (1978) (applying "the general rule that statutes codifying the common law are to be construed in a manner consistent with the common law").

There is a wealth of case law concerning the capable of repetition rule. Although it has deep roots in nineteenth-century case law, the first case to recognize the rule as such was *So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 US 498, 31 S Ct 279, 55 L Ed 310 (1911). In that case, a railway company challenged an order of the Interstate Commerce Commission to cease and desist giving certain preferences to a shipper of cottonseed products. By the time the case reached the United States Supreme Court, the agency order had expired, and, on that ground, there was a motion to dismiss the appeal. The Court denied the motion, however. Orders such as the one at issue, the Court explained, "are usually continuing (as are manifestly those in the case at bar), and these considerations ought not to be, as they might be, defeated, by shortterm[ ] orders, capable of repetition, yet evading review." *Id.* at 514.

Since *So. Pac. Terminal Co.*, every jurisdiction in the country, save Oregon, has adopted the capable of repetition rule. *See generally* Richard H. Fallon, David Shapiro, and Daniel J. Meltzer, *Hart & Wechsler's The Federal Courts and the Federal System* § 4, 219 (4th ed 1996) (describing development of doctrine); Erwin Chemerinsky, *Federal Jurisdiction* 37-145 (1989) (same); *see also Yancy*, 337 Or at 375-83 (Balmer, J., specially concurring) (listing state courts adopting doctrine).

In that regard, federal law has long been settled that the capable of repetition exception applies to election-related challenges. *See generally* Charles Alan Wright et al, 13C *Federal Practice & Procedure* § 3533.9 (3d ed 2008) (noting that federal courts frequently apply the capable of repetition, yet evading review exception in election disputes). *Meyer v. Grant*, 486 US 414, 108 S Ct 1886, 100 L Ed 2d 425 (1988), provides an example close in point. In that case, the plaintiffs were proponents of a particular initiative measure that they hoped to get on the state ballot for the November 1984 election. They challenged the constitutionality of a state law prohibiting the use of paid petition circulators. While the action progressed, the 1984 election came and went. The United States Supreme Court explained that, although the election had passed, the matter was subject to the mootness exception for cases that are capable of repetition, yet evading review. *Id.* at 417 n 2. The Court noted that state law gave the proponents of the measure only six months to obtain the necessary signatures, and "[t]he likelihood that a proponent could obtain a favorable ruling within that time, much less act upon a ruling in time to obtain the needed signatures, is slim at best." *Id.*

More recently, in *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 US 449, 127 S Ct 2652, 168 L Ed 2d 329 (2007), a corporate advocacy group challenged the constitutionality of a federal law restricting the right of corporations to broadcast radio and television ads during the "blackout" period of 30 days before the 2004 Wisconsin primary election. By the time the matter reached the Supreme Court, the election had passed. The Federal Election Commission argued that the case had become

moot. Moreover, the agency argued that, because "the 2-year window between elections provides ample time for parties to litigate their rights," the matter was not subject to the exception for cases capable of repetition, yet evading review. *Id.* at 462. The Supreme Court rejected that argument, concluding that the case "fit comfortably within the established exception." *Id.* "[I]t would be entirely unreasonable," the Court said, "to expect that [the plaintiff] could have obtained complete judicial review of its claims" in that time. *Id.*[8]

State courts, likewise, apply the exception to election cases. *See, e.g.*, *Falke v. State*, 717 P2d 369, 371 (Alaska 1986) (applying exception to challenge to election division's decision not to strictly implement statutory filing requirements for candidates); *Urevich v. Woodard*, 667 P2d 760, 762 (Colo 1983) ("This case falls, as do so many elections cases, within the exception to the mootness doctrine that allows review of matters 'capable of repetition, yet evading review.'"); *Gunaji v. Macias*, 130 NM 734, 737, 31 P3d 1008, 1101 (2001) (applying exception to challenge to election of county commissioner whose term had expired); *Blum v. Lanier*, 42 Tex Sup Ct J 955, 997 SW2d 259, 264 (1999) (applying exception to challenge to election process).

The fact that there is a possibility that a particular case could obtain expedited consideration is beside the point. ORS 14.175 applies to types or categories of cases in which it is "likely" that such challenges will avoid judicial review. Moreover, the sole statute that the secretary mentions as an example of expedited review is ORS 246.910(4), which applies only to judicial review of actions, or failures to act, of the Secretary of State—a statute that we have held

---

[8] *See also Renne v. Geary*, 501 US 312, 320, 111 S Ct 2331, 115 L Ed 2d 288 (1991) (noting that mootness exception for cases capable of repetition, yet evading review has been applied in election cases); *Masters, Mates & Pilots v. Brown*, 498 US 466, 473, 111 S CT 880, 112 L Ed 2d 991 (1991) (applying exception to challenge to union rule barring mailing of election literature before date of nominating convention); *Norman v. Reed*, 502 US 279, 287-88, 112 S Ct 698, 116 L Ed 2d 711 (1992) (issue of eligibility to use political party name on election ballot mooted by passage of election, but nevertheless reviewable under capable of repetition exception); *First National Bank of Boston v. Bellotti*, 435 US 765, 774, 98 S Ct 1407, 55 L Ed 2d 707 (1978) (challenge to statute limiting corporate political expenditures reviewable even though election had passed).

does not apply to this case. Aside from that, the statute only affords a trial court and the Court of Appeals "discretion" to give particular cases precedence. The secretary does not explain, and we do not understand, on what basis the theoretical availability of a discretionary decision to grant expedited review makes it not "likely" that a challenge will evade judicial review.

For the same reason, the fact that this court theoretically could accept certification of an appeal from the Court of Appeals or that it could exercise discretion to entertain a mandamus action does not establish that cases such as plaintiff's are unlikely to evade review. In fact, this court has noted that, "ordinarily there will be no reason why issues of election law, like any other, cannot be decided by the Court of Appeals." *State ex rel Bunn v. Roberts*, 302 Or 72, 77, 726 P2d 925 (1986). Certainly, the fact that there are two reported cases in which parties have successfully completed litigation within an election cycle is insufficient to establish the point, at least not without knowing the number of cases in which the courts denied such expedited consideration.[9]

The settled case law concerning the capable of repetition exception persuades us that ORS 14.175 applies to election cases such as the one before us. We find no indication from the text of the statute or its history that the legislature intended to include a requirement that the plaintiffs in each case exhaust every possible avenue of expedition as a predicate to invoking the statutory exception to the rule against deciding moot cases. We therefore conclude that the trial court and the Court of Appeals erred in holding that plaintiff is not entitled to proceed under ORS 14.175.

---

[9] For example, reported decisions reveal at least three cases involving challenges under ORS 246.910, each of which took two years or more to bring to final judgment. *Hazell v. Brown*, 352 Or 455, 287 P3d 1079 (2012) (involving a declaratory judgment action to enforce a voter-approved ballot initiative—decided six years from filing); *League of Oregon Cities*, 334 Or 645 (involving a constitutional challenge to a voter-approved initiative measure—the Court of Appeals certified appeal to this court and the case was still not decided until nearly two years after filing); *Masters v. Secretary of State*, 88 Or App 221, 744 P2d 1309 (1987) (post-election challenge to voters' pamphlet statements—decided three years after filing).

C.  *Is ORS 14.175 constitutional?*

      That brings us to the "obvious question," as the Court of Appeals phrased it: whether the statute violates the Oregon Constitution because it runs afoul of this court's decision in *Yancy*, which held that the "judicial power" that Article VII (Amended), section 1, of the Oregon Constitution confers on the courts does not include the authority to decide moot cases and, in addition, does not include the authority to recognize any exceptions to that limitation, including an exception for controversies that are capable of repetition, yet evade review. The secretary argues that *Yancy* held only that *the courts* lack authority to decide moot cases, not that *the legislature* cannot confer such authority. In the secretary's view, nothing in *Yancy* forecloses the legislature from enacting ORS 14.175.

      The secretary's argument cannot be reconciled with this court's decisions in *Oregon Medical Assn. v. Rawls*, 276 Or 1101, 557 P2d 664 (1976) (*Oregon Medical Association I*), and *Oregon Medical Association v. Rawls*, 281 Or 293, 574 P2d 1103 (1978) (*Oregon Medical Association II*). In *Oregon Medical Association I*, the association initiated an action for a declaration concerning the constitutionality of a recently enacted statute concerning liability insurance for medical professionals. The trial court dismissed the action for want of a justiciable controversy, and this court affirmed. The court noted that the positions of the parties were not adverse as to the issue before the court and, moreover, no party had actually been subject to the law. *Id*. at 1107-08. The action, the court held, was not yet ripe. *Id*. at 1110.

      In response, the legislature amended the law that was at issue in *Oregon Medical Association I*, adding a provision that expressly authorized the Insurance Commissioner and the Oregon Medical Association to initiate an action for a declaration as to the constitutionality of that statute. The legislation provided that "'a justiciable controversy ripe for determination shall be deemed to exist in the event a complaint is filed.'" *Oregon Medical Association II*, 281 Or at 296 (quoting Or Laws 1977, ch 269 § 11). The Insurance Commissioner and the Oregon Medical Association tried again to obtain a declaration from this court, but, once

again, this court declared the matter nonjusticiable. The court explained that "a proceeding that calls upon a court to conduct its own inquiry into hypothetical applications of a statute and possible interpretations to save it from hypothetical constitutional attacks cannot be 'deemed' a justiciable controversy." *Id*. at 300.

By parity of reasoning, if *Yancy* correctly holds that the "judicial power" conferred under Article VII (Amended), section 1, does not permit the courts to recognize a mootness exception for cases that are capable of repetition, yet evade review, then that limitation on the judicial power cannot be "deemed" eliminated by legislative enactment.

The question then becomes whether *Yancy* was correct in so holding. *Stare decisis* does not permit this court to revisit a prior decision merely because the court's current members may hold a different view than its predecessors about a particular issue. At the same time, *stare decisis* is not absolute. *See generally [Farmers Ins. Co. v. Mowry](#)*, 350 Or 686, 697-98, 261 P3d 1 (2011) ("[S]*tare decisis* is not mechanistic. Rather, *stare decisis* is a prudential doctrine that is defined by the competing needs of stability and flexibility in Oregon law."). Especially in cases involving the interpretation of the state constitution, the value of stability that is served by adhering to precedent may be outweighed by the need to correct past errors. This court, after all, "is the body with the ultimate responsibility for construing our constitution, and, if we err, no other reviewing body can remedy that error." *[Stranahan v. Fred Meyer, Inc.](#)*, 331 Or 38, 53, 11 P3d 228 (2000).

Precisely what constitutes an "error" sufficient to warrant reconsideration of a constitutional precedent cannot be reduced to a neat formula. But our cases reflect at least three categories. First, there are cases in which a prior pronouncement amounted to *dictum* or was adopted without analysis or explanation. *See, e.g., [State v. Christian](#)*, 354 Or 22, 40, 307 P3d 429 (2013) (overruling prior decisions that extended, without explanation, overbreadth analysis beyond free-speech cases). Second, there are cases in which the analysis that does exist was clearly incorrect—that is, it finds no support in the text or the history of the relevant

constitutional provision. *See, e.g.*, *State v. Mills*, 354 Or 350, 370-71, 312 P3d 515 (2013) (overruling prior decisions that found "no support in the wording of the constitution *** [and] no support in the historical circumstances of the adoption" of the constitutional provision at issue). Third, there are cases that cannot be fairly reconciled with other decisions of this court on the same constitutional provision. *See, e.g.*, *State v. Savastano*, 354 Or 64, 93-94, 309 P3d 1083 (2013) (overruling prior decision that could not be reconciled with earlier and subsequent case law).

This case is an example of the third category. As has been observed for a number of years, this court has not steered an even course in its justiciability case law. *See, e.g.*, *Utsey v. Coos County*, 176 Or App 524, 528, 32 P3d 933 (2001) ("[W]e must be candid: The cases concerning the constitutional requirements of justiciability are murky at best; at times, they are flatly contradictory."). In particular, this court's decisions in *Yancy* and *Kellas v. Dept. of Corrections*, 341 Or 471, 145 P3d 139 (2006), have caused uncertainty about the extent to which the state constitution imposes justiciability limitations on the exercise of judicial power by the courts.

The problem lies in the fact that *Yancy* and *Kellas* reflect two starkly different—and irreconcilable—views of the power conferred by Article VII (Amended), section 1.

In *Yancy*, the court addressed whether it should recognize an exception to the doctrine that the court lacks constitutional authority to decide moot cases. The court explained that such issues as standing, ripeness, and mootness are all aspects of justiciability—that is, the authority of the court to exercise "judicial power" as authorized by Article VII (Amended), section 1, of the state constitution. 337 Or at 349. The court noted that the relevant test of justiciability has always been whether "'the court's decision in the matter will have some practical effect on the rights of the parties to the controversy.'" *Id.* (quoting *Brumnett*, 315 Or at 405). The court discussed the historical context of the original judicial power provision of the state constitution, including decisions of the United States Supreme Court on the authority of federal courts under Article III of the federal constitution. The

court concluded that, although it could not derive from that research a "definitive conclusion regarding the scope of judicial power under the Oregon Constitution," it nevertheless believed that "the prevailing view throughout the American legal landscape in 1857 was that the constitutional grant of judicial power did not include the power to decide cases that had become moot." *Id*. at 362. It then explained that the later adoption of Article VII (Amended) "did nothing to change the earlier understanding of judicial power." *Id*. The court ultimately concluded that the judicial power "does not extend to moot cases," not even moot cases that are capable of repetition, yet evading review. *Id*. at 363.

Then-Associate Justice (now Chief Justice) Balmer specially concurred, explaining that he found nothing in the text, context, or historical background of the constitution to suggest that the framers intended courts to lack *authority* to decide moot cases, particularly those that involve events that are so brief that they inevitably conclude before the courts can render a final decision. *Id.* at 364. In Justice Balmer's view, the relevant history and prior case law reflect a prevailing view of "the contours of mootness as a *prudential*, rather than a constitutional, matter." *Id*. at 367 (emphasis added).

In *Kellas*, the court took a completely different approach to justiciability—one easier to reconcile with Justice Balmer's specially concurring opinion in *Yancy* than with the majority opinion in that case. At issue in *Kellas* was the constitutionality of a statute that conferred on "any person" standing to challenge the validity of administrative rules, regardless of whether those persons would be affected by those rules. 341 Or at 473. Given *Yancy*'s explanation that standing is an aspect of constitutional justiciability— which the court said requires a judicial decision to have a "practical effect on the rights of the parties"—the answer would seem to have been straightforward: Regardless of an absence of legislative standing requirements, the constitution does not permit courts to decide cases unless a judicial decision would have a practical effect on the rights of the parties. But that is not how *Kellas* was decided.

In *Kellas*, the court cautioned against reading into the judicial power clause of Article VII (Amended), section 1,

"constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government." 341 Or at 478. The court noted that the "cases" or "controversies" clause of Article III, section 2, of the United States Constitution had given rise to an extensive body of case law regarding the justiciability of disputes in federal court, which includes such matters as standing, mootness, and ripeness. But, the court observed, "The Oregon Constitution contains no 'cases' or 'controversies' provision." *Id.* For that reason, the court concluded, "we cannot import federal law regarding justiciability into our analysis of the Oregon Constitution." *Id.* The court noted that, historically, Oregon courts have avoided imposing justiciability barriers to litigation and have, instead, left such matters to legislative prerogative. *Id.* at 480-82. In the end, the court found no constitutional impediment to the legislature granting any person the right to challenge administrative rules, regardless of whether a judicial decision on the matter would affect them. *Id.* at 486.

Thus, on the one hand, *Yancy* holds that justiciability is a constitutional doctrine, rooted in the conferral of "judicial power" under Article VII (Amended), section 1, and based in part on case law arising under Article III of the federal constitution. But, on the other hand, *Kellas* holds that we should be loath to "import federal law regarding justiciability into our analysis of the Oregon Constitution" to erect "constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government." 341 Or at 478. The fact of the matter is that none of the aspects of justiciability that the majority in *Yancy* listed—standing, mootness, or ripeness—finds the sort of direct textual support that *Kellas* suggests is required to support a "constitutional barrier to litigation." The two decisions cannot be reconciled.[10]

---

[10] It could be argued that the two decisions, in fact, are reconcilable because *Yancy* concerned mootness and *Kellas* concerned standing. The argument, however, is unavailing. First, *Yancy* itself describes standing as an aspect of the justiciability required by Article VII (Amended), section 1, contrary to *Kellas*. *Yancy*, 337 Or at 349 (describing both standing and mootness as "encompassed" within justiciability). Second, and more importantly, both opinions broadly discuss the meaning of the "judicial power" conferred by Article VII (Amended), section 1, in fundamentally different and incompatible ways. Third, reading *Kellas* to apply to standing, but not mootness, makes no sense. It would mean that standing is

Not surprisingly, *Yancy* and *Kellas* have given rise to uncertainty about the current state of justiciability doctrine. *See, e.g.*, *LaForge v. Dept. of Human Services*, 237 Or App 500, 502 n 1, 241 P3d 313 (2010) (noting that *Yancy* holds that the Oregon Constitution extends "judicial power" only to justiciable cases, while *Kellas* holds that "there is no constitutionally grounded justiciability requirement"); *Pendleton School Dist.*, 220 Or App at 65 (*Yancy* and *Kellas* "leave the current status of [justiciability] doctrines in some doubt"); *Friends of Columbia Gorge v. Columbia River Gorge*, 215 Or App 557, 571, 171 P3d 942 (2007) (following *Yancy* and *Kellas*, "[i]t is not clear to us what remains of the previous justiciability jurisprudence of this state"); *see also* Greg Chaimov, "Justiciability," in Oregon State Bar, *Oregon Constitutional Law* §§ 11.1, 11.4 (2013) (noting "tension" between *Yancy* and *Kellas*).

The uncertainty that *Yancy* and *Kellas* have engendered cannot be ignored. As we have noted, if *Yancy* was correctly decided, then it would seem necessarily to follow that ORS 14.175 is unconstitutional. But if *Kellas* applies, there would seem to be no constitutional impediment to the legislature conferring the authority to review otherwise moot cases that are capable of repetition, yet evading review. We turn, then, to a reexamination of the "judicial power" provision of Article VII (Amended), section 1, of the Oregon Constitution.

---

not constitutionally required (*Kellas*), but dismissal for mootness is (*Yancy*). The problem with such a reading is that, as the court explained in *Yancy*, standing and mootness are inextricably related. Mootness, as it is often observed, is simply "standing in a time frame." Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale LJ 1363, 1384 (1973) ("[Mootness] is the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."); *see also Arizonans for Official English v. Arizona*, 520 US 43, 68 n 2, 117 S Ct 1055, 137 L Ed 2d 170 (1997) (describing mootness as "the doctrine of standing in a time frame"); *Loisel v. Rowe*, 233 Conn 370, 378-79, 660 A2d 323, 328 (1995) ("Mootness is the doctrine of standing in a time frame."); *Realen Valley Forge Greenes Associates v. Upper Merion Twp. Zoning Hearing Bd.*, 941 A2d 739, 743 n 7 (Pa 2008) (same). If it were otherwise, then a case in which the legislature authorized "any person" to bring a challenge to a rule or statute regardless of personal stake could, upon filing, become instantly moot for want of a personal stake in the outcome. *Hamel v. Johnson*, 330 Or 180, 184, 998 P2d 661 (2000) ("Even if a case otherwise is justiciable, if the court's decision 'no longer will have a practical effect on or concerning the rights of the parties,' then the matter will be dismissed as moot." (quoting *Brumnett*, 315 Or at 406)). Either justiciability is constitutionally required, or it is not.

As a general matter, we examine the text of the constitution in its historical context, along with relevant cases interpreting it. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992). In conducting that examination, our purpose is not to freeze the meaning of the state constitution to the time of its adoption, but is instead "to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances." *State v. Davis*, 350 Or 440, 446, 256 P3d 1075 (2011).

The court has, on occasion, characterized the proper approach to construing amendments to the state constitution adopted by initiative in slightly different terms. In *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 871 P2d 106 (1994), the court held that the interpretation of amendments adopted by initiative should be governed by the same process that is used in the interpretation of statutes, as provided in *PGE*, 317 Or at 610-12. *PGE*, of course, imposed a strictly sequential approach to interpretation that did not permit examination of enactment history in the absence of a demonstrated textual ambiguity. Analysis of original constitutional provisions under *Priest*, in contrast, imposed no such restriction.

More recently, in *Gaines*, 346 Or at 171-72, this court abandoned the strictly sequential requirements of *PGE*. In consequence, the court has dispensed with the requirement of establishing an ambiguity before examining the history of a constitutional amendment adopted by initiative. Now, as in the case of statutory construction, when construing constitutional amendments adopted by initiative, we "consider the measure's history, should it appear useful to our analysis," without necessarily establishing the existence of multiple reasonable constructions of the provision at issue. *State v. Algeo*, 354 Or 236, 245, 311 P3d 865 (2013) (citing *Gaines*).

The effect of that shift in interpretive approach is that there remains little, if any, practical distinction between our approach to the construction of original provisions of the constitution and our method of interpreting provisions later adopted by initiative. In all cases, we examine the text, in its historical context and in light of relevant case law, to

determine the meaning of the provision at issue most likely understood by those who adopted it, with the ultimate objective of identifying "'relevant underlying principles that may inform our application of the constitutional text to modern circumstances.'" *State v. Sagdal*, 356 Or 639, 642, 343 P3d 226 (2015) (quoting *State v. Davis*, 350 Or at 446).

    1.   *Constitutional text*

        The "judicial power" vested in the judicial branch was first described in two provisions of the original 1857 state constitution. Article VII, section 1, provided:

> "The Judicial power of the State shall be vested in a Supr[e]me Court, Circuit[] Courts, and County Courts, which shall be Courts of Record having general jurisdiction, to be defined, limited, and regulated by law in accordance with this Constitution."

And Article VII, section 9, provided:

> "All judicial power, authority, and jurisdiction not vested by this constitution or by laws consistent therewith, exclusively in some other Court shall belong to the Circuit Courts, and they shall have appellate jurisdiction, and supervisory authority over the County Courts, and all other inferior Courts, Officers, and tribunals."

From the bare text of those provisions, at least two things are noteworthy. First, nothing in the text of the constitution itself defined the term "judicial power." Second, nothing in the text of the constitution itself imposed any limitations on its exercise. Neither of the judicial-power provisions was patterned after the judicial-power provisions of the federal constitution, which expressly limited the exercise of judicial power by federal courts to specifically enumerated categories of "cases" and "controversies."[11] To the contrary, the

---

[11] Article III, section 2, of the United States Constitution provides:

"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different states;—between Citizens of the same State claiming Lands under Grants of different States, and between a State or the Citizens thereof, and foreign States, Citizens or Subjects."

1857 constitution vested "[a]*ll* judicial power" in the courts, without limitation or qualification.

That departure from the federal pattern was apparently deliberate. The original Article VII, in fact, was one of the few provisions of the 1857 constitution to have been largely drafted from scratch. *See* Claudia Burton, *A Legislative History of the Oregon Constitution of 1857: Part II*, 39 Willamette L Rev 245, 393-94 (2003).[12]

In 1910, the voters amended the constitution, approving a new Article VII, which addressed a number of different issues pertaining to the courts—in particular, judicial elections and terms of office, jury verdicts in civil cases, grand juries, and the standard of review of jury verdicts. The new Article VII also eliminated the original Article VII, section 9, and reworded section 1 to provide that "[t]he judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

As with the original Article VII, section 1, the new version referred to the "judicial power" of the state, but did not define or otherwise delineate it. Importantly, Article VII (Amended), section 1—like its predecessor—did not include any limitations on the "judicial power" that the courts are authorized to exercise. In particular, like the original, the 1910 judicial power provision omitted any reference to the sort of "case or controversy" limitations that appear in Article III of the federal constitution.

2.  *Historical context*

Because the text of Article VII (Amended), section 1, offers little help in discerning what its framers understood "judicial power" to mean, we must examine the historical

---

[12] Carey suggests that the source of Article VII was the 1848 Wisconsin Constitution, apparently based on the similarity of wording. *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 475-76 (Charles Henry Carey ed. 1926). Palmer, on the other hand, says that "the article on the judicial department is a combination of (1) the minds of the members of the Committee of the Judicial Department, (2) the judicial system in vogue under the territorial government, and (3) the Wisconsin judicial system as outlined in Article VII, Wisconsin Constitution of 1848." W.C. Palmer, *The Sources of the Oregon Constitution*, 5 Or L Rev 200, 207 (1926).

context of its adoption for possible evidence of a settled understanding of the term.

The judicial power of state courts pre-dates the ratification of the federal constitution. It derives from the common law. *Van Lom v. Schneiderman*, 187 Or 89, 119, 210 P2d 461 (1949) ("In determining the extent of the limitations upon judicial power it is relevant to consider that the power to grant a new trial is a common law right inherent in all courts of general common law jurisdiction.").[13]

### a.   Early common law

English common-law decisions reveal scant, if any, evidence of concerns about what we would now term "justiciability." To the contrary, English courts recognized the right of "strangers"—those with no personal interest in a particular dispute—to enforce public rights by prerogative writs, such as prohibition, *certiorari*, *quo warranto*, and mandamus.[14] *See generally* Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 Yale LJ 816, 827 (1969). As one prominent scholar explained,

> "The English tradition of *locus standi* in prohibition and [*certiorari*] is that a stranger has standing, but relief in suits by strangers is discretionary. If, however, the official's lack of 'jurisdiction' * * * appeared on the face of the record, relief followed as of course. * * * The rule that a stranger has *locus standi* has been explained on the ground that a usurpation of jurisdiction, being an encroachment upon the royal prerogative, caused such concern that it made little difference who raised the question."

---

[13] *See also In re Creighton's Estate*, 60 Neb 796, 84 NW 273, 275-76 (1900) (tracing judicial power to common-law courts of England); *Ex parte Steinmetz*, 35 Ohio App 491, 496, 172 NE 623, 625 (1930) (judicial power, particularly in civil cases, "is largely dependent upon the common law"); *Gorham v. Robinson*, 57 RI 1, 186 A 832, 863 (1936) ("[T]he term 'judicial power' in section 1 is to be interpreted in light of the common law."); *In re Constitutionality of Section 251.18, Wis. Statutes*, 204 Wis 501, 236 NW 717, 718 (1931) ("What constitutes judicial power, within the meaning of our constitution, is to be determined in the light of the common law and of the history of our institutions as they existed anterior to and at the time of the adoption of the constitution.").

[14] The practice may date back even further, to Roman times. *See generally* S.A. de Smith, *Judicial Review of Administrative Action* 423 (2d ed 1968) ("In Roman law it was open to any citizen to bring an *action populares* in respect of a public delict or to sue for a prohibitory or restitutionary interdict for the protection of *res sacrae* and *res publicae*.").

Louis L. Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv L Rev 1265, 1274 (1961); *see also* Cass R. Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich L Rev 163, 171 (1992) ("Before and at the time of the framing [of the federal constitution], the English practice was to allow strangers to have standing in the many cases involving the ancient prerogative writs."); Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan L Rev 1371, 1394-95 (1988) ("[T]he English, colonial, and post-constitutional practices suggest [a common understanding considering] as justiciable actions concerning general governmental unlawfulness, even in the absence of injury to any specific person, and even when prosecuted by any common citizen with information about the alleged illegality.").

Sir Edward Coke, for example, in the document now known as *Articulo Cleri*, recognized the right of persons who we would modernly describe as lacking "standing" to obtain a writ of prohibition. The matter involved a complaint by certain clergy to the King about what they alleged to be the unwarranted granting of writs of prohibition by courts against the exercise of ecclesiastical jurisdiction. In response to the complaint, the judges of the King's Bench said that

> "[p]rohibitions by [l]aw are to be granted at any time to restraine a [c]ourt to intermeddle with, or execute any thing, which by [l]aw they ought not to hold plea of, and they are much mistaken that maintaine the contrary. * * * And the king[']s [c]ourts that may award [p]rohibitions, being informed either by the parties themselves, or by any stranger, that any [c]ourt [t]emporall or [e]cclesiastical doth hold plea of that (whereof they have not jurisdiction) may lawfully prohibit the same, as well as after judgement and execution, as before."

Edward Coke, 2 *Institutes of the Laws of England* 602 (1797). Blackstone noted the existence of such "popular actions," which he explained "were given to the people in general." William Blackstone, 3 *Commentaries* \*161 (1765). That "strangers" could initiate such popular actions was

recognized in England at least through the nineteenth century. *See, e.g.*, *Wadsworth v. Queen of Spain*, 17 QB 171, 214 (1851) (Lord Campbell: "We find it laid down in books of the highest authority that, where the court to which prohibition is to go has no jurisdiction, a prohibition may be granted upon the request of a *stranger*, as well as the defendant himself. 2 Coke 607." (Emphasis in original.)).[15]

　　　Early American cases likewise reflect little concern with what we now think of as justiciability. *See* Winter, 40 Stan L Rev at 1374 ("[A] painstaking search of the historical material demonstrates that—for the first 150 years of the Republic—the Framers, the first Congresses and the [Supreme] Court were oblivious to the modern conception" of justiciability.). The word "justiciable," in fact, does not appear in a single court decision before Oregon's constitution was ratified in 1857.[16] The sixth edition of Bouvier's law dictionary, published in 1856, does not even include an entry for the word. John Bouvier, *A Law Dictionary: Adapted to the Constitution and Laws of the United States of America and of the Several States of the American Union* (6th ed 1856). So far as we can determine, the term first appeared in *Tyler v. People*, 8 Mich 320, 337 (1860), in which a concurring opinion used the term to refer to the extent to which the courts can provide a remedy, as a matter of substantive law. Later cases used the term to refer to the extent to which the court has jurisdiction to decide a matter. *See, e.g.*, *Ex parte*

---

[15] One author has challenged the notion that English courts did not require a personal stake in the outcome as a prerequisite to initiating prerogative proceedings. Bradley S. Clanton, *Standing and the English Prerogative Writs: The Original Understanding*, 63 Brook L Rev 1001, 1008 (1997). His argument, however, does not contest that private parties were permitted to initiate public actions without a showing of a personal stake; rather it contends that, because such actions were predicated on the fiction that private parties initiated public actions in the name of the King, those cases are simply "irrelevant." *Id.* at 1033. As other scholars have noted, that argument does not really undermine the fundamental fact that there was no suggestion that the judicial power did not include the authority to entertain such privately initiated public actions. *See, e.g.*, Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich L Rev 2239, 2241 n 15 (1999).

[16] That is, in English. Two Louisiana Supreme Court decisions used the word "justiciable," but they did so in quoting pleadings that had been filed in French. *State v. Martin*, 2 La Ann 667 (1847); *State v. Grailhe*, 1 La Ann 183 (1846).

*McNeely*, 36 W Va 84, 14 SE 436, 439 (1892) ("But I regard
it a question of jurisdiction arising under the constitution;
and that nowhere in the state can trial be had except in that
county where the offense is committed, and if not enough of
the act occurred in the county of death to enable us to say
that the offense was committed there, then it has no juris-
diction, nor has any county in the state; for I construe the
clause as meant to be co-extensive with all criminal acts
justiciable under the power of the state."); *Thwing v. Great
Western Ins. Co.*, 111 Mass 93, 97 (1872) (cases "were not
justiciable in Massachusetts").

Nineteenth-century case law, although perhaps not
using the modern vocabulary of "justiciability," nevertheless
did touch on the matter in two respects: standing to pursue
prerogative writs and mootness.

b.    Nineteenth-century case law: prerogative writs

Nineteenth-century American case law drew a
distinction between obtaining prerogative writs to enforce
private rights and those to enforce public rights. In the for-
mer case, the authorities required a showing of a personal
legal interest, as a matter of substantive law (not—it bears
some emphasis—as a matter of constitutional authority to
exercise judicial power). In the latter case, the authorities
required no such showing; as with the English authorities,
American courts recognized that strangers with no partic-
ular personal interest could bring such actions to vindicate
public rights. As the Supreme Court of Illinois explained
in *Pike County Comm'rs. v. People ex rel. Metz*, 11 Ill 202,
207-08 (1849):

> "The question, who shall be the relator *** depends upon
> the object to be attained by the writ. Where the remedy
> is resorted to for the purpose of enforcing a private right,
> the person interested in having the right enforced, must
> become the relator. *** A stranger is not permitted offi-
> ciously to interfere, and sue out a mandamus in a matter
> of private concern. But where the object is the enforcement
> of a public right, the People are regarded as the real party,
> and the relator need not show that he has any legal inter-
> est in the result. It is enough that he is interested, as a

citizen, in having the laws executed, and the right in question enforced."[17]

Reviewing the case law on the subject several decades later, the United States Supreme Court noted the Illinois Supreme Court's decision and commented that "[t]here is *** a decided preponderance of American authority in favor of the doctrine, that private persons may move for a mandamus to enforce a public duty, not due to the government as such." *Union Pacific R.R. v. Hall et al.*, 91 US 343, 355, 23 L Ed 428 (1875). Whether to grant relief to such private persons with no personal stake, the court observed, was "discretionary with the court, and it may well be assumed that it will not be unnecessarily granted." *Id*. But, importantly, there is no mention in that case—or, indeed, in any of the case law—about a constitutional impediment to granting relief to persons who lacked such a personal interest in the outcome beyond an interest in having the law properly enforced.

To be sure, the rule was not universally recognized. A few courts rejected the idea that one without a personal interest could bring an action for a prerogative writ.[18] In *Sanger v. County Comm'rs.*, 25 Me 291, 296 (1845), for example, the Maine Supreme Court explained that it has for a very long time been well-settled law in the state that "a private individual can apply for this remedy only in those cases where he has some private or particular interest to be subserved *** independent of that which he holds in common with the public at large; and it is for the public officers,

---

[17] *See also Hamilton v. State ex rel. Bates*, 3 Ind 452, 458 (1852) ("Were this a case merely for private relief, the relator would have to show some special interest. But here the case is different. *** It is a case for the enforcement, not of a private, but of a public right; and it is not necessary, in such cases, that the relator should have a special interest in the matter, or that he should be a public officer."); *State ex rel. Rice v. Marshall County Judge*, 7 Iowa 186, 187 (1858) ("In a matter of public right, any citizen may be a relator in application for a writ of mandamus."); *People ex rel. Case v. Collins*, 19 Wend 56, 56 (1837) ("In the matter of a *public right*, any citizen of the state may be a *relator* in an application for a mandamus, (where that is the appropriate remedy,) to enforce the execution of the common law or of an act of the legislature; it is otherwise in cases of *private* or *corporate rights*." (Emphasis in original.)).

[18] Modern scholarship explains what was, at the time, the minority view as a product of misconceptions about the nature of the English precedents, in particular, the fact that Blackstone discussed mandamus only in the portion of his *Commentaries* devoted to private remedies. Winter, 40 Stan L Rev at 1403 n 167.

exclusively to apply where public rights are to be subserved."[19] But the court reached that conclusion as a matter of substantive law. Again, there is no mention of a *constitutional* impediment to courts entertaining actions initiated by parties who lack a personal stake in the outcome. That idea did not surface in the case law until the twentieth century. Indeed, as late as 1905, the author of a treatise on administrative law summarized the law pertaining to obtaining prerogative writs: "The courts *** have held with regard to the *quo warranto* that it may be issued on the demand of any citizen of responsibility; and the better rule would seem to be that in matters of public concern any citizen or taxpayer may apply for the *mandamus*." Frank Goodnow, *The Principles of Administrative Law of the United States* 432 (1905).

In short, both in 1857, when the original state constitution was adopted, and in 1910, when the people adopted Article VII (Amended), section 1, the general rule was that persons with no personal stake could initiate public actions to vindicate public rights. The fact that such actions could be maintained is incompatible with constitutional conceptions of standing and justiciability that later developed in the twentieth century.[20] Even in states in which courts held that a private stake was required, the prerequisite was a function of substantive law. In no case of which we are aware did a court conclude that a private stake in the outcome of a controversy was required for the courts to exercise "judicial power."

c.   Nineteenth-century case law: mootness

There is little discussion in nineteenth-century decisions of dismissing "moot" cases. In large part, that is because the word "moot" meant something different in that century than it came to mean in later years. Matthew Hall, *The Partially Prudential Doctrine of Mootness*, 77 Geo Wash

---

[19] *See also People ex rel. Drake v. Regents of the Univ. of Mich.*, 4 Mich 98, 103 (1856) (declining to follow New York and Illinois mandamus practice).

[20] As Professor Sunstein explains, the first appearance of "standing" in the sense that we use the term today to connote an aspect of justiciability did not occur until the early-twentieth century, and the constitutionalization of standing did not occur until even later than that. Sunstein, 91 Mich L Rev at 179-81.

L Rev 562, 568 (2009). In the early- to mid-nineteenth century, an argument that was "moot" was one that was open to argument; when an argument had been "mooted," that meant that it had been argued. *See Black's Law Dictionary* 1029 (8th ed 2004) (listing "archaic" definitions of "moot"). Thus, for example, in *Leonora v. Scott*, 10 La 651, 651 (1855), the Louisiana Supreme Court noted that, "[s]everal points were mooted in the court below and generally decided in favor of the plaintiff."[21] Not until the late-nineteenth and early-twentieth centuries did courts begin to use the term "moot" in the sense that is familiar to us now.

Still, courts during the nineteenth century confronted the problem that we now describe as "mootness," whether because parties "feigned disputes" or because events rendered actual disputes "abstract" or "hypothetical." And the consistent—indeed, so far as we can tell, uniform—practice of the state courts was to treat the dismissal of moot cases as a matter of discretion, not constitutional imperative. Hall, *The Partially Prudential Doctrine of Mootness*, 77 Geo Wash L Rev at 569 ("[N]ineteenth-century decisions generally do not indicate that the court lacked authority to hear moot cases. Rather, courts dismissed moot cases using language suggesting an exercise of discretion."). We have been unable to identify a single state-court decision from the nineteenth century that dismissed a case on the ground that deciding moot cases exceeded the "judicial power" conferred by the state constitution.

---

[21] *See also Logan v. State*, 28 Tenn 24, 26 (1848) ("Some other points have been mooted, but not seriously pressed, in this case; we think there is nothing in them, and that they need no discussion by the court."); *Swain v. People*, 5 Ill 178, 178 (1843) ("[T]hese points are too well settled and established to be ever mooted in the English courts."); *Vantilburgh v. Shann*, 24 NJL 740, 749 (1853) ("But appellate courts will not reverse for causes not mooted, or objections not raised in the court below."); *State v. Boehler*, 220 Mo 4, 4, 119 SW 385, 385 (1909) ("In the motion in arrest the constitutionality of the local option law was mooted for the first time."); *Holland v. Depriest*, 130 Mo 89, 89, 31 SW 928, 928 (1895) ("[T]he constitutionality of [a statute] was not mooted in any manner in the circuit court."); *Wellborn v. Estes*, 70 Ga 390, 404 (1883) ("We do not propose to enter upon the discussion of the much mooted and stubbornly contested point."); *In re Wilson*, 10 NM 32, 32, 60 P 73, 74 (1900) ("The scope and effect of the commerce clause of the constitution of the United States has been a much-mooted question before the courts, both state and federal."); *City of St. Louis v. Flynn*, 128 Mo 413, 31 SW 17, 20 (1895) ("This conclusion obviates an inquiry into the various constitutional questions mooted in the briefs.").

Illustrating the "feigned dispute" category of cases is *Blair v. State Bank of Illinois*, 8 Mo 313, 313 (1843), in which the parties attempted to stipulate to facts that actually did not exist to obtain a ruling from the court. The Missouri Supreme Court dismissed the appeal, explaining that "we do not feel ourselves at liberty to entertain questions presented in the manner in which this is done." *Id.* at 315. Likewise, in *Smith v. Cudworth*, 41 Mass 196 (1837), the parties agreed that the court could decide an issue that had not actually arisen between them. The court dismissed that appeal, as well, explaining that entertaining the gambit

> "would convert the highest tribunal in the State into a moot court to decide questions which might never arise, or to lay down rules for the government of cases in which the real parties would have had no opportunity to be heard. The members of this [c]ourt *** have quite labor enough to perform the duties which necessarily and legally devolve upon them."

*Id.* at 197.

In other types of moot cases, nineteenth-century and early-twentieth-century courts ruled similarly, not on the basis of a perceived constitutional limitation, but rather as a matter of prudence and discretion—often stating what the courts "will not," or are not "disposed to," decide. In *State ex rel. Martin v. Sloan*, 69 NC 128 (1873), for example, the business that was the subject of the action had been sold by the time the case reached the North Carolina Supreme Court. The court concluded that the business "having been sold, neither party has any interest in the case except as to cost. When that is the case, we are not in the habit of deciding the case."[22] *Id.* at 128. There is no mention of a lack of constitutional "judicial power" to decide the case.

---

[22] *See also Sawyer v. City of Blakely*, 2 Ga App 159, 159, 58 SE 399, 400 (1907) ("Courts will not gratuitously decide moot constitutional questions."); *Aiken v. City of Columbus*, 167 Ind 139, 78 NE 657, 661 (1906) ("In no instance is this court disposed to decide moot questions."); *Chicago, I. & L. R. Co. v. Indianapolis & N.W. Traction Co.*, 165 Ind 453, 74 NE 513, 515 (1905) ("[T]he constitutional question advanced must be regarded in the nature of a moot question, which this court will not consider."); *Chicago, R.I & P. Ry. Co. v. Territory*, 21 Okla 329, 97 P 265, 266 (1908) ("It has been held *** that 'the Supreme Court will not decide abstract or hypothetical cases disconnected from the granting of actual relief, or from the determination of which no practical relief can follow.'").

Precisely because the courts regarded the subject as one of judicial discretion, in the late-nineteenth and early-twentieth centuries they fashioned exceptions to the general practice of dismissing moot cases. For example, in the late-nineteenth century, state courts began to hold that cases involving issues of particular "public importance" would be decided, even if otherwise moot. *People ex rel. Press Publ'g. Co. v. Martin*, 142 NY 228, 36 NE 885 (1894), provides an illustration of the development. In that case, the relator challenged the lawfulness of certain election practices. But by the time the matter came to decision, the election had already taken place. The court nevertheless addressed the legal issues presented, explaining that, "while the time has long since passed when any decision in this matter can have any practical, efficient operation, we will, in view of the public importance of the questions involved, overlook that circumstance and proceed to the determination of the matter upon its merits." *Id*. at 234.[23]

Thus, once again, at the time of the framing of the 1857 constitution, as well as the adoption of the 1910 amendments to it, there was no suggestion in the case law that the "judicial power" that may be exercised by the courts included a limitation on the authority of the courts to decide moot cases. To the contrary, courts disposed of moot cases as a matter of prudence, discretion, and judicial economy. Consistently with that view of the judicial power, courts by the time of the adoption of Article VII (Amended) recognized exceptions to the dismissal of moot cases, especially in cases of public importance. The existence of such exceptions is fundamentally incompatible with the idea that the judicial power excluded the authority to decide moot cases.

---

[23] *See also State ex rel. Keltgen v. McMahon*, 94 Minn 532, 532, 103 NW 1133, 1133 (1905) (ruling on whether the respondent to the *quo warranto* action had unlawfully usurped a public office, even though the term of office had already expired); *Cuyahoga County Department State Sup'rs v. State ex rel. Green*, 26 Ohio CD 521, 523 (1908) ("The first two grounds suggest that any order this court might make now would be a *brutum fulmen*; that naught remains but an academic question. We do not think the point well taken. A proper interpretation of election laws is of so much importance to all our citizens that the courts must answer questions with regard thereto when submitted to them, notwithstanding the fact that the rights of individual are usually determined in such matters before the reviewing courts can pass upon them, by the holding of an election.").

d.   Federal case law and justiciability

As we have noted, Article III of the federal constitution limits federal court exercise of judicial power to enumerated "cases" and "controversies." In the latter half of the twentieth century, federal courts developed a doctrine of justiciability—embracing various components including standing, mootness, and ripeness—predicated on that textual limit on the judicial power. Two points in that regard are significant for our purposes.

First, the foregoing doctrinal developments were expressly based on the text of Article III, which limits the exercise of judicial power to "cases" or "controversies." As we have noted, Oregon's constitution—like nearly all state constitutions—does not include that textual limitation on the exercise of judicial power. Rather, it is well settled that state judicial power, unencumbered by a case-or-controversy limitation, is "plenary." *See, e.g.*, *Borrego v. Territory*, 8 NM 446, 46 P 349, 363 (1896) ("judicial power * * * is thus vested in plenary terms"); *Floyd v Quinn*, 24 RI 147, 52 A 880, 881 (1902) ("[T]he vesting of the judicial power is plenary and exclusive.").

Second, the development of federal justiciability doctrine as a constitutional limitation rooted in Article III did not occur until well into the twentieth century. For example, the first mention of mootness as a constitutional impediment to a federal court's exercise of judicial power did not occur until 1964, in *Liner v. Jafco, Inc*., 375 US 301, 306 n 3, 84 S Ct 391, 11 L Ed 2d 347 (1964) ("[O]ur lack of jurisdiction to review moot cases derives from the requirements of Article III of the [c]onstitution under which the exercise of judicial power depends upon the existence of a case or controversy.").[24] Before that time, it had been settled

---

[24]  Especially interesting is the fact that the authorities that the United States Supreme Court cited in support of that conclusion consisted of two law review articles, not prior case law. Moreover, the law review articles actually offered faint support for the proposition for which the Court cited them. The first of the two articles did not even assert that the rule against deciding moot cases was constitutionally based. Rather, it said that, "[u]nder the Federal Constitution, the courts of the United States can render decisions only in 'cases' and 'controversies.' However, these terms inherently are capable of many varying interpretations and have never been defined authoritatively. *Hence, any restriction of judicial power created by construction of such terms may properly be termed self-imposed*."

law that "the mootness doctrine was treated simply as a rule of economy and good sense in judicial administration." Tribe, *American Constitutional Law* § 3-11, at 82 n 1. As with the state court decisions that we have discussed, federal courts in the nineteenth and early-twentieth centuries certainly did dismiss moot cases, but they did so for prudential reasons; none mentioned the Constitution or Article III as the source of the ruling. For example, in *Smith v. United States*, 94 US 97, 97, 24 L Ed 32 (1876), the defendant in a criminal case absconded from custody during the pendency of the appeal. The United States Supreme Court declined to address the merits of the appeal, explaining that, "we are not inclined to hear and decide what may prove to be only a moot case."[25]

And, also like their state-court counterparts, the federal courts developed exceptions to the general rule of dismissal of moot cases. In 1897, for instance, the United States Supreme Court recognized a public-interest exception. In *U.S. v. Freight Association*, 166 US 290, 17 S Ct 540, 41 L Ed 1007 (1897), the federal government challenged the lawfulness of a price-fixing association of railway companies. The trial court dismissed the action, and the court of appeals affirmed. The government sought review in the United States Supreme Court. But, while review was pending, the members of the association under challenge voted to dissolve it. They then sought dismissal on the ground that the matter had become moot. The Supreme Court, however, declined to grant the dismissal, because deciding otherwise

---

Note, *Cases Moot on Appeal: A Limit on the Judicial Power*, 103 U Pa L Rev 772 (1955) (emphasis added). The other article asserted that a moot case "is neither a case nor a controversy in the constitutional sense," without further elaboration or supporting authority. Sidney A. Diamond, *Federal Jurisdiction to Decide Moot Cases*, 94 U Pa L Rev 125 (1946).

[25] *See also Allen v. Georgia*, 166 US 138, 140, 17 S Ct 525, 41 L Ed 949 (1897) ("[W]e have repeatedly held that we would not hear and determine moot cases."); *The Richmond &c. Railroad Co. v. Louisa. Railroad Co.*, 54 US 71, 82, 14 L Ed 55 (1851) ("But however probable as this dispute or contest may be, it is not for this court to anticipate it, and volunteer an opinion in advance."); *Lord v. Veazie*, 49 US 251, 254-55, 12 L Ed 1067 (1850) ("[A]ny attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or purposes, when there is no real and substantial controversy between those who are adverse parties to the suit, is an abuse which courts of justice have always reprehended.").

would encourage strategic avoidance of adverse appellate court decisions on matters of public interest:

> "The defendants having succeeded in the court below, it would only be necessary thereafter to dissolve their association and instantly form another of a similar kind, and the fact of the dissolution would prevent an appeal to this court or procure its dismissal if taken. This result does not and ought not to follow."

*Id.* at 309. The Court noted that, of course, "private parties may settle their controversies at any time." *Id.* In this instance, however, the Court explained that the voluntary dissolution of the challenged association did not result in an "extinguishment of the rights (whatever they are) of the public, the enforcement of which the government has endeavored to procure by a judgment of a court." *Id.*[26]

And, in 1911, the Court—relying on its decision in *Trans-Missouri Freight Ass'n.*—recognized an additional exception for cases that otherwise would be moot, but are capable of repetition and concern a matter of public interest. *So. Pac. Terminal Co.*, 219 US at 514. Importantly, the Court's opinion made no mention of the judicial power or any limitations on it derived from Article III; only that the court thought it prudent to recognize an exception to its usual practice of dismissing moot cases.

### e.   Federal case law and advisory opinions

An additional bit of historical context must be addressed, concerning the rule against issuance of advisory opinions, because the rule against advisory opinions has been invoked as a justification for broader justiciability doctrines. Historically, the English courts were no strangers to advisory opinions. *See generally* Stewart Jay, *Most Humble Servants: The Advisory Role of Early Judges* 4

---

[26] *See also Boise City Irr. & Land Co. v. Clark*, 131 F 415, 418-19 (9th Cir 1904) ("It is contended on the part of the appellees that, as the period for which the rate in question was fixed has expired, the case has become but little, if any, more than a moot case; but the courts have entertained and decided such cases heretofore, partly because the rate, once fixed, continues in force until changed as provided by law, and partly because of the necessity or propriety of deciding some question of law presented which might serve to guide the municipal body when again called upon to act in the matter.").

(1997) ("For centuries British judges had been called upon to advise the Crown and its ministries, often by providing formal advisory opinions on legal questions."); Evan Tsen Lee, *Deconstitutionalizing Justiciability: The Example of Mootness*, 105 Harv L Rev 603, 639 n 204 (1992) ("Historical English practice appears to have been quite familiar with advisory opinions."). As early as 1575, the government asked judges to provide advice as to the execution of penal statutes and the administration of the Poor Laws. *See* W.S. Holdsworth, 4 *A History of English Law* 75 n 4, 76 n 3 (2d ed 1937).

Colonial American governments followed the British practice, with judges "continually involved in the process of advising executive and legislative bodies." Jay, *Most Humble Servants*, at 52. Even after the Revolution, at least at first, the prevalent view was that the President of the United States had the right to obtain advice from the Supreme Court. *See generally* Mel A. Topf, *The Jurisprudence of the Advisory Opinion Process in Rhode Island*, 2 Roger Williams U L Rev 207, 210 (1997); Note, *The Advisory Opinion and the U.S. Supreme Court*, 5 Fordham L Rev 94, 102 (1936). In 1790, for instance, President Washington wrote the Justices of the Supreme Court requesting their opinions on the Justices' duties as circuit riders under the newly formed judiciary system; the Justices responded that a statutory requirement that they ride circuit was constitutionally dubious. Robert P. Dahlquist, *Advisory Opinions, Extrajudicial Activity and Judicial Advocacy: A Historical Perspective*, 14 Sw U L Rev 46, 50-51 (1983); *see also* Stewart Jay, *Most Humble Servants*, at 2 ("Supreme Court justices in the 1790s did counsel the executive on a number of occasions.").

Later in the 1790s, however, the federal courts concluded that they could not issue advisory opinions in two categories of cases. The first category involved legislation that required judges to make decisions that were subject to review by other branches of government. *Hayburn's Case*, 2 US 408, 1 L Ed 436 (1792), involved just such a statute, one that authorized the federal courts to determine veterans' disability benefits subject to review by the Secretary of War and, ultimately, Congress. Three justices of the Supreme

Court, who had been sitting as circuit court judges on cases arising under that statute, concluded that the statute was unconstitutional, because it authorized judges to issue decisions reviewable by the executive and legislative branches. The Attorney General filed a petition for a writ of mandamus to enforce the law. While the action was pending, however, Congress changed the statute. The Court declined to grant relief because, it explained, Congress had already done so. *Id.* at 409-10. In other words, the Court concluded that the case had become moot (although it did not use that term).

Interestingly, the Court published, as an unnumbered footnote, the decision of the three justices declaring the now-amended statute unconstitutional because "the reasons assigned by the judges, for declining to execute the first act of Congress, involve a great constitutional question." *Id.* at 410 n *. The note explains that the three justices concluded that the statute was unconstitutional because it rendered their opinions only "advisory," in the sense that they are reviewable by a non-judicial government official. The three justices explained:

> "That by the constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either. That neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties but such as are properly judicial, and to be performed in a judicial manner. That the duties assigned to the circuit by this act are not of that description *** inasmuch as it subjects the decisions of these courts, made pursuant to those duties, first to the consideration and suspension of the secretary of war, and then to the revision of the legislature."

*Id.* at n *. Since its publication, *Hayburn's Case* has become known chiefly for the footnoted opinion of the three justices sitting as circuit court judges, which, in the nineteenth century, was cited for the proposition that judges should not issue "advisory" opinions that were reviewable by other branches of government. *See, e.g., United States v. Ferreira,* 54 US 40, 49, 14 L Ed 40 (1852) (a judge who makes decisions

that are subject to review by other branches of government is not exercising "judicial power"; citing *Hayburn's Case*).

As scholars since have noted, *Hayburn's Case*, as well as *Ferreira*, involved a very particular type of "advisory" opinion—one that involved a judge rendering an opinion that was subject to review by another branch of government, which violated constitutional principles of separation of powers. *See, e.g.*, Lee, *Deconstitutionalizing Justiciability*, 105 Harv L Rev at 646 (the circuit courts, in *Hayburn's Case*, concluded that the statute "violated the constitutional imperative of an independent judiciary in a national government of separated powers").[27]

The second category of advisory opinions involved requests for judicial opinions outside the context of any judicial proceeding. In 1793, President George Washington asked Chief Justice John Jay to answer 29 questions put to the Court by concerning the propriety of a policy of neutrality toward France. The Chief Justice declined to answer any of the President's questions, explaining that

"[there are] lines of separation drawn by the Constitution between the three departments of government. These being in certain respects checks on each other—and our being judges of a court of the last resort—are considerations which afford strong arguments against the propriety of our extrajudicially deciding the questions alluded to."

Letter from Chief Justice John Jay and Associate Justices to President Washington (Aug 8, 1793), in 3 *Correspondence and Public Papers of John Jay, 1782- 1793*, at 488 (Henry P. Johnson ed. 1891). Again, the circumstances were particular—calling for advice, and not a judicial decision—and the justifications for refusing to address the President's questions were couched in terms of judicial independence and separation of powers.

---

[27] Indeed, the case actually was decided on narrower grounds than that. Strictly speaking, *Hayburn's Case* turned on whether the Attorney General could prosecute the action without first seeking authorization from the President. *See generally* Maeva Marcus and Robert Teir, *Hayburn's Case: A Misinterpretation of Precedent*, 1988 Wisc L Rev 527. Nineteenth-century cases, however, seized on the footnote and cited the case to support separation-of-powers arguments. *Id.* at 541. Importantly, it was not until 1926 that *Hayburn's Case* was cited for a broader "case-or-controversy" rule. *Tutun v. United States*, 270 US 568, 576, 46 S Ct 425, 70 L Ed 738 (1926).

### f.   Nineteenth-century Oregon cases

Decisions of this court on the subject of justiciability generally, and mootness particularly, are few. Without exception, however, they reflect the view that the judicial power of the state broadly includes the authority to hear cases, particularly cases of public importance, without regard to whether the cases are moot or have been brought by individuals without a personal stake in the outcome.

In *Burnett v. Douglas County*, 4 Or 388 (1873), a county court had issued an order concerning the redemption of certain county-issued warrants. Several taxpayers sought a writ of review, challenging the lawfulness of that order in circuit court. The circuit court denied the writ, and the taxpayers appealed. This court affirmed. The court explained that the writ ordinarily would not issue unless the challenged decision was "judicial" in nature; that is, the challenged decision must concern the rights of individual parties who had sought relief from a court. *Id.* at 391-92. In contrast, the court said, nonjudicial "general order[s]" are treated differently. *Id.* A "general order," the court explained, is one that "d[oes] not and cannot affect any particular person or class of persons," but "will continue to operate in a very general manner upon the entire body of the taxpayers of the county." *Id.* at 392. According to the court, "[i]n all cases where the proceeding sought to be reviewed involves a matter of public interest affecting a great number of persons, the allowance of the writ is in the sound discretion of the [c]ourt, and if refused, the refusal is not subject to review or appeal." *Id.* Thus, the court's decision was consistent with the general rule of nineteenth-century cases that we have described above, recognizing the justiciability of cases involving a matter of "public interest," regardless of whether they were initiated by a person with a personal stake in the outcome.

In *State v. Ware*, 13 Or 380, 10 P 885 (1886), the relator sought a writ of mandamus to correct certain election notices. At oral argument, a question arose about whether the relator had any personal interest in the outcome of the matter independent of the interest of the public generally. The court ultimately decided that the lack of such a personal stake was no impediment to proceeding to the merits:

> "[T]he decided weight of authority supports the proposition that, where the relief is merely for the protection of private rights, the relator must show some personal or special interest in the subject-matter, since he is regarded as the real party in interest, and his right must clearly appear. On the other hand, where the question is one of public right, and the object of the *mandamus* is to procure the enforcement of a public duty, the people are regarded as the real party, and the relator, at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result."

*Id.* at 382-83 (emphasis in original). Again, the court's description of the law thus was consistent with the common-law tradition concerning initiating public actions, dating back to pre-Revolutionary England. *See also State ex rel. Durkheimer v. Grace*, 20 Or 154, 158, 25 P 382 (1890) ("[A]s the question at bar is one of public right, and the object of the mandamus is to enforce the performance of a public duty *** it is not necessary that the relators should show any special interest or particular right to be affected by the result.").

And to similar effect is *David v. Portland Water Committee*, 14 Or 98, 12 P 174 (1886), in which a number of taxpayers challenged the authority of a statutorily created "water committee" to issue bonds. At the time they initiated the action, though, the committee had not yet levied a tax on the taxpayers. The court noted that "[a] question has been raised as to the right of the [taxpayers] to maintain the suit, as to whether they have any standing in court." *Id.* at 125. The court opined that its "impressions" were "adverse to the right." *Id.* Nevertheless, "in view of the importance of the case, we have concluded not to consider [the standing issue]." *Id.*

g.  Significance of the historical context

The foregoing examination of the historical context—of the 1857 constitution and, particularly, of the 1910 amendments—shows a complete absence of evidence that the framers would have understood the "judicial power" conferred in either 1857 or in 1910 to have been limited to

what we now term "justiciable" cases. To the contrary, the relevant case law shows that courts permitted persons with no personal stake in the outcome to initiate "public actions" and that, while moot cases could be dismissed, the decision to do so was one of judicial discretion and could depend on whether the issues were of particular public importance. Federal case law was entirely consistent with that state law practice, culminating in the explicit recognition of exceptions to the mootness doctrine for cases of public interest and cases that are capable of repetition, yet evade review. The notion that federal courts are without constitutional authority to decide "nonjusticiable" cases did not emerge until well into the twentieth century.

To recap the bidding so far, then: Nothing in the text of Article VII, section 1, or Article VII (Amended), section 1, imposes any limitations on the exercise of "judicial power." In particular, there are no "case or controversy" limitations of the sort that are imposed under Article III of the United States Constitution. Nor are there any explicit references to a lack of constitutional authority to hear cases initiated by parties lacking a personal stake in the outcome. Moreover, nothing in the historical context of either provision of the Oregon Constitution lends support for the notion that the framers would have understood them to have included such limitations implicitly because of the very nature of the term "judicial power," at least not in public action cases or those involving issues of "public importance."

3. *Later Oregon case law*

We turn, then, to an examination of Oregon cases decided after the adoption of the 1910 amendments. As we have noted, the court has not been consistent in its views of justiciability generally, and mootness particularly. Rather, over the course of the last 100 years, the cases have veered back and forth between regarding justiciability as a constitutional imperative and treating it as a prudential consideration.

The court began to address justiciability in the declaratory judgment context. In *Oregon Cry. Mfgs. Ass'n*, 159 Or at 100, a group of dairy processors and distributors

challenged the constitutionality of the Oregon Agricultural Marketing Act. At the time they initiated the declaratory judgment action, however, the act had not yet been applied to them. This court held that the matter was not justiciable. "Deciding hypothetical cases," the court explained, "is not a judicial function. Neither can courts, in the absence of constitutional authority, render advisory opinions." *Id.* at 109. The court cited no Oregon case law for that assertion. Rather, it cited a then-recent decision of the United States Supreme Court, *Electric Co. v. Comm'n.*, 303 US 419, 58 S Ct 678, 82 L Ed 936 (1938), in which the Court declined to hear a similar challenge arising under the Federal Declaratory Judgment Act.

But, in *Perry v. Oregon Liquor Commission*, 180 Or 495, 177 P2d 406 (1947), the court took a different approach to justiciability. In that case, the plaintiff challenged the suspension of her license to serve liquor. By the time that her case reached the Oregon Supreme Court, however, the period of suspension had expired. The court noted that the expiration of the suspension did moot the appeal, but it decided the merits of the case anyway:

> "We agree that courts ordinarily do not determine moot questions. There is, however, a well recognized exception to this general rule. Where the question is one involving the public welfare, and there is a likelihood of it being raised again in the future, a court in the exercise of its discretion may decide it for the guidance of an official administrative agency."

*Id.* at 498-99.[28]

---

[28] *Perry* was later followed in a number of cases. *See, e.g.*, *State ex rel. v. Newbry et al.*, 196 Or 331, 337, 248 P2d 840 (1952) ("[W]e shall determine the case on the merits, even though it be moot[.] *** We are moved to do so by the general public interest."); *State ex rel. v. Smith et al.*, 197 Or 96, 126, 252 P2d 550 (1953) ("Even if we assume, arguendo, that the Company's tax payment did, in fact, render the present controversy moot, we are, nonetheless, moved to a determination of the cause because of the evident general public interest in the result."); *Linklater v. Nyberg*, 234 Or 117, 120, 380 P2d 631 (1963) ("[N]othing remains for the writ to operate upon and the case in that sense has become moot. *** Be that as it may, there is a question here of sufficient general public interest to warrant its consideration and decision."); *Stowe v. School Dist. No 8-C*, 240 Or 526, 528, 402 P2d 740 (1965) ("It is apparent from the facts that the issue is, in reality, moot. Because of the public nature of the question presented and the likelihood that it will recur we will decide the case.").

*Dickman et al v. School Dist. 62C et al*, 232 Or 238, 366 P2d 533 (1962), is likewise difficult to reconcile with the approach to justiciability reflected in *Oregon Cry. Mfgs. Ass'n*. In that case, the plaintiff taxpayers challenged the constitutionality of a state statute that authorized the distribution of publicly-funded textbooks to all schools, including parochial schools operated by the Catholic Church. On appeal, the defendants argued that the plaintiffs lacked standing because they had not shown that they or any of their families attended school. The court noted that prior Oregon cases "do not provide us with a clear guide" to the question of taxpayer standing. *Id.* at 244. But, because the defendants had not raised the matter in their pleadings to the trial court, the court determined, the matter was waived. *Id.* at 245. "If standing were a jurisdictional matter then, of course, defendants could raise the question at any stage in the proceedings. But we do not so regard it and we hold, therefore, that defendants' failure to raise the issue by a proper pleading constitutes a waiver of that issue." *Id.*

But then a few short years later, the court held, in *Cummings Constr. v. School Dist. No. 9*, 242 Or 106, 109, 408 P2d 80 (1965), that "courts do not have jurisdiction to entertain a declaratory judgment action requesting the interpretation of a statute or a declaration of one's rights thereunder unless there is a 'justiciable controversy' between the parties." The court did not mention *Dickman*. But it did cite *Oregon Cry. Mfgs. Ass'n. Id.*

In a similar vein is *Gortmaker v. Seaton*, 252 Or 440, 450 P2d 547 (1969), in which the court dismissed an action brought by a district attorney to obtain the court's interpretation of a newly enacted statute concerning the regulation of certain illegal drugs. The court explained that "it is fundamental to appellate jurisprudence" that courts do not decide abstract or hypothetical cases. *Id.* at 442. The court added that, "It can be argued that the public interest in the suppression of illegal drugs is so strong that the court should brush aside questions of standing and justiciable controversy and decide the case on its merits." *Id.* at 443. Without citing *Perry*—or any of the half-dozen cases following it—for just that proposition, however, the court cited

instead *Oregon Cry. Mfgs. Ass'n* and concluded that deciding the case on the merits would result in the issuance of an impermissible advisory opinion. *Id.* at 444.

In the 1980s, the court was more explicit in rejecting *Perry.* In *State ex rel Oregonian Publishing Co. v. Sams*, 298 Or 329, 692 P2d 116 (1984), the relators petitioned for a writ of mandamus ordering certain hearings to be conducted in public. This court issued an alternative writ, and the trial court complied. The relators nevertheless asked the court to rule on the merits of their claim, citing *Perry*, *Linklater*, and *Newbry.* The court noted the prior decisions, declined to address "whether those cases were rightly decided under their own circumstances or whether they can be distinguished from the present case," and concluded that "a court cannot properly pursue an issue upon an alternative writ of mandamus after the person to whom the writ is addressed has complied with its command." *Id.* at 332-33.

In *Hay v. Dept. of Transportation*, 301 Or 129, 719 P2d 860 (1986), the plaintiffs challenged a Department of Transportation rule authorizing public use of the beach in front of their ocean-front hotel as a parking area. During the pendency of the appeal, the rule expired by its own terms. The parties, citing *Perry*, argued that, even though the expiration of the rule might have rendered the appeal moot, the court should rule on the merits owing to the public importance of the issues involved. The court summarily rejected the argument. Noting its decision in *Oregonian Publishing Company*, the court explained that "[r]ecent cases have cast doubt on the validity of * * * *Perry*." *Id.* at 134.[29]

In the 1990s, the court appeared to supply more of an explanation for its rejection of *Perry*: namely, that justiciability is a constitutional requirement. In *People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 817 P2d 1299 (1991), the court determined that an association lacked standing to challenge a University of Oregon order approving

---

[29] *See also Kay v. David Douglas Sch. Dist. No. 40*, 303 Or 574, 577, 738 P2d 1389 (1987), *cert den*, 484 US 1032 (1988) (suggestions that *Perry* allows moot cases of public significance to be decided "have been discarded in recent cases and should not be followed"); *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 367-68 n 9, 723 P2d 298 (1986) (noting that the court had declined to follow *Perry* in "[m]ore recent decisions").

research on barn owls. The court noted that, "*aside from certain constitutional considerations* not presented by this case, a reviewing court's inquiry into the standing of an entity seeking judicial review is confined to an interpretation of legislative intent." *Id.* at 99 (emphasis added). Because the court determined that the association did not satisfy the statutory-standing requirement, it did not need to address any "constitutional considerations." But the mention of those "constitutional considerations" signaled a return to the earlier, constitutional view of justiciability. *See also Brian v. Oregon Government Ethics Commission*, 319 Or 151, 156, 874 P2d 1294 (1994) (quoting *People for Ethical Treatment*, 312 Or at 99).

In *Barcik*, 321 Or 174, the court was even more explicit in constitutionalizing justiciability. In that case, several high school students sought a declaratory judgment regarding the lawfulness of certain school district regulations concerning official student publications. But, by the time the trial court made its decision, the students had graduated. This court reversed and remanded for dismissal of the claims, because the graduation of the student plaintiffs had rendered the case moot. Citing *Oregon Cry. Mfgs. Ass'n*, the court explained that "[t]his court has applied the justiciability requirement to declaratory judgment actions for over fifty years *and has noted the constitutional origins of that requirement*." *Id.* at 188 (emphasis added).

The following year, in *McIntire v. Forbes*, 322 Or 426, 909 P2d 846 (1996), the court was even clearer. In that case, two taxpayers challenged the constitutionality of a recently enacted statute, which included a provision permitting "interested persons" to initiate such challenges. That prompted a question concerning the justiciability of the petitioners' claims. *Id.* at 428. The court addressed that question in two parts. First, the court addressed the "statutory standing" of the petitioners: that is, it addressed whether the petitioners satisfied the statutory requirement that they be "interested persons." *Id.* at 432-33. After concluding that the petitioners, as taxpayers, stated an adequate interest to satisfy the statute, the court then proceeded to a second inquiry, *viz.*, constitutional justiciability, determined by examining whether a judgment of the court would have a

"practical effect" on the petitioners' rights. *Id*. at 433-34. The court's analysis thus made clear that, independent of any statutory-standing requirements, the constitution imposed justiciability requirements of its own.

That brings us to *Yancy*, which even more firmly and explicitly grounded this state's justiciability doctrine in the constitution—specifically, the "judicial power" provision of Article VII (Amended), section 1. In the process, the court concluded that "*Perry* and the cases that relied on *Perry* were wrongly decided." 337 Or at 363.

But *Yancy* was closely followed by *Kellas*, in which the court abjured the constitutionalization of justiciability and concluded that matters of standing were properly left to the legislative branch. 341 Or at 478. In the process, the court declared that cases such as *Oregon Cry. Mfgs. Ass'n* must not be understood to stand for the proposition that justiciability is constitutionally required; instead, the court said, those decisions are properly regarded as concerning the *statutory*-standing requirements of the Declaratory Judgments Act. *Id*. at 484. The court disavowed *People for Ethical Treatment*, *Brian*, and *McIntire* as having improperly constitutionalized justiciability doctrine. *Id*. at 485-86.

### 4. *Reassessing justiciability*

We are left with essentially two competing conceptions of justiciability in our case law. On the one hand, we have *Yancy*, which viewed justiciability as a constitutional requirement inherent in the nature of "judicial power" conferred under Article VII (Amended), section 1, of the state constitution. On the other hand, we have *Kellas*, which concluded that nothing in the text or historical context of Article VII (Amended), section 1, suggests such limitations on the exercise of judicial power.

In light of our reexamination of the text, historical context, and case law relevant to the adoption of Article VII (Amended), section 1, we conclude that *Kellas* has the better of the argument, at least to the extent that courts are presented with "public actions" or cases involving matters of "public interest." *Kellas* correctly observed that nothing in the text imposes any limits on the exercise of "judicial power"

under Article VII (Amended), section 1. It further correctly noted that, historically, Oregon courts long have recognized the authority of courts to entertain public actions without regard to whether those who initiate such actions have a personal stake in their outcome. To be sure, *Kellas* fairly may be faulted for glossing over some of the inconsistencies in this court's case law over the last century. In particular, *Kellas* was plainly wrong in attempting to re-characterize the *Oregon Cry. Mfgs. Ass'n* line of cases as nonconstitutional, declaratory judgment cases only. As we have noted, *Oregon Cry. Mfgs. Ass'n* itself, as well as later cases such as *Barcik*, identified the constitution as the source of the justiciability requirements that those cases applied. Still, the bottom line of *Kellas* stands as essentially correct.

The same cannot be said of *Yancy*. *Yancy* began by acknowledging that the text of Article VII (Amended), section 1, says nothing about justiciability, standing, mootness, ripeness, or any other limitation on the judicial power exercised by the courts of this state. 337 Or at 352. The court nevertheless concluded that the very nature of the "judicial power" itself implicitly includes such limitations. The court based that conclusion on an analysis of the historical context of Article VII (Amended), section 1. Unfortunately, that analysis was seriously incomplete.

To begin with, the court failed to consider the English common-law practice recognizing the authority of courts to hear public actions regardless of whether the plaintiffs have a personal stake in the outcome. The court further overlooked the nineteenth-century American adoption of that same practice. As we have noted, there was in the latter part of the century a distinctly minority view to the contrary. But there is a complete absence of evidence that the framers of the Oregon constitution intended to adopt it. *See [State v. Supanchick](#)*, 354 Or 737, 764, 323 P3d 231 (2014) (assuming framers would have understood common-law context for constitution); *Portland v. Hirsch-Weis Mfg. Co.*, 123 Or 571, 577, 263 P 901 (1928) ("It is but reasonable to assume" that the framers understood terms in the constitution to comport with usage "familiar to common law or equity."); *Allen v. Hirsch*, 8 Or 412, 415 (1880) (it

is "a settled canon of constitutional interpretation" that, in absence of evidence to contrary, framers are assumed to have adopted common-law meanings of constitutional terms). It also failed to address the practice of nineteenth- and early-twentieth-century courts—including this court—of addressing otherwise moot cases that presented issues of significant public interest and that were capable of repetition. All of that evidence is incompatible with *Yancy*'s conclusion that the framers of the Oregon Constitution would have understood the "judicial power" to preclude exercising authority to decide such cases.

Instead, *Yancy* claimed support for its interpretation of "judicial power" in essentially three places. First, it relied on the several instances in which the justices of the United States Supreme Court declined to issue advisory opinions, in particular, *Hayburn's Case*. But those instances concerned the exercise of judicial power under the federal constitution, which, as we have noted, is subject to limitations not present in Article VII (Amended), section 1. Moreover, the cases involved particular institutional concerns that inhere in requests for judicial decisions that either are reviewable by other branches of government or involved requests for advice outside the context of a judicial proceeding. As a result, as we have noted, those cases were construed in the nineteenth century to apply to those circumstances and were viewed as turning on separation of powers principles; the notion that the cases stood for broader conceptions of justiciability did not surface until the twentieth century and well after the adoption of the 1910 amendments to the Oregon Constitution.

Second, *Yancy* claimed support from more recent federal court case law arising under Article III. 337 Or at 360. But, as we have noted, federal justiciability case law is not predicated on the meaning of "judicial power" *simpliciter*, but on the case-or-controversy *limitations* on the judicial power. *See, e.g.*, *Federal Election Comm'n. v. Akins*, 524 US 11, 20, 118 S Ct 1777, 141 L Ed 2d 10 (1998) ("Article III, of course, limits Congress' grant of judicial power to 'cases' or 'controversies.'"); *Allen v. Wright*, 468 US 737, 750, 104 S Ct 3315, 82 L Ed 2d 556 (1984) ("Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and

'controversies.'"); *Muskrat v. United States*, 219 US 346, 356, 31 S Ct 250, 55 L Ed 246 (1911) ("By the express terms of the Constitution, the exercise of the judicial power is limited to 'cases' and 'controversies.'").[30] Because Oregon's constitution contains no such limitations, there is no textual basis for drawing support from the federal justiciability case law. *See Kellas*, 341 Or at 478 ("The Oregon Constitution contains no 'cases' or 'controversies' provision."); *see also* James W. Doggett, *"Trickle Down" Constitutional Interpretation: Should Federal Limits on Legislative Conferral of Standing Be Imported Into State Constitutional Law?*, 108 Colum L Rev 839, 876 (2008) ("Given the importance these words ['cases' and 'controversies'] have taken on in American legal discourse, and given the divergences between the federal and state judicial powers, the failure of state constitutions to explicitly incorporate them should be read as additional authority for courts to diverge from federal practices.").[31]

Third, *Yancy* claimed support from one early Oregon decision, *Burnett*. As *Yancy* characterized it, *Burnett* stands for the proposition that, to be a proper exercise of the judicial power, proper parties with a personal stake in the outcome must appear before the court. 337 Or at 359. That, however, is not what *Burnett* stands for. As we have explained, *Burnett* first noted that, ordinarily, a writ of review will not issue

---

[30] It could be argued that, in light of the history that we have cited, the textual differences between Article III of the federal constitution and this state's constitution are irrelevant, because even the existence of the case-or-controversy limitation in the former does not justify federal justiciability doctrine. That is to say, it could be argued that federal justiciability doctrine itself is implausible. In fact, the argument has been made by a number of scholars. *See, e.g.*, Robert J. Pushaw, Jr., *Justiciability and Separation of Powers: A Neo-Federalist Approach*, 81 Cornell L Rev 393, 490 (1996) (federal mootness doctrine is "incomprehensible"); Erwin Chemerinsky, *A Unified Approach to Justiciability*, 22 Conn L Rev 677, 696 (1990) ("The law in the area of justiciability is a mess."); William A. Fletcher, *The Structure of Standing*, 98 Yale LJ 221, 221 (1988) ("The structure of standing law in the federal courts has long been criticized as incoherent."). That is not, however, a torch for this court to carry.

[31] *See also* Hans A. Linde, *The State and the Federal Courts in Governance: Vive La Difference!*, 46 Wm & Mary L Rev 1273, 1287-88 (2005) ("It is not prudent to link a decision declining adjudication to non-textual, self-created constitutional barriers" such as those adopted by federal courts under Article III.); Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 Harv L Rev 1833, 1905 (2001) ("[T]he concerns that motivate federal justiciability doctrine are not wholly applicable to the theory or practice of state governance.").

unless the challenged order was judicial in nature. 4 Or at 391. In that context, the court said that "judicial" orders are those involving proper parties with a personal stake. *Id.* at 391-92. The court then noted that, notwithstanding that ordinary rule, challenged orders of a more "general" character—operating "in a very general manner upon the entire body of the taxpayers of the county"—still are justiciable, even though no party had a personal stake in the outcome. *Id.* at 392. According to the court, "[i]n all cases where the proceeding sought to be reviewed involves a matter of public interest affecting a great number of persons, the allowance of the writ is in the sound discretion of the court." *Id.* Thus, directly contrary to the way that *Yancy* characterized it, *Burnett* is consistent with the general practice of courts in the nineteenth century to review actions involving public rights.

*Burnett*—properly understood—also is consistent with the court's 1886 decision in *David*, in which it held that it had authority to review a case brought by a plaintiff who lacked standing, "in view of the importance of the case." 14 Or at 125. *Yancy* acknowledged *David*. 337 Or at 359. But it declined to give it any weight, because the decision "offered no justification, constitutional or otherwise, for entertaining a case in which the plaintiffs seemed to lack standing, beyond the fact that the court seemed to believe that the public needed an answer." *Id.* If the court had examined the relevant nineteenth-century and earlier case law, however, it would have found that *David* was not an outlier, but rather was consistent with longstanding doctrine. The fact that *David* failed to offer further explanation for its conclusion is not surprising; to the court in *David*, the explanation was obvious.

In its discussion of nineteenth-century Oregon cases, *Yancy* also omitted any reference to *Ware* or *Durkheimer*, which as we have noted also recognized the authority of courts to entertain public actions regardless of the standing of those who initiated them. Such cases are inconsistent with *Yancy*'s conclusion that the settled meaning of "judicial power" foreclosed deciding them.

In short, *Yancy*'s analysis is undercut by significant omissions and by misinterpretations of the historical evidence of what the framers likely would have understood of the "judicial power" conferred by the constitution. The decision must be disavowed in favor of *Kellas*.

In disavowing the justiciability analysis of *Yancy*, we do not hold that the state constitution imposes no constraints on the exercise of judicial power. This case does not require such a broad holding. Rather, we hold that, based on the foregoing analysis of the text, historical context, and case law interpreting Article VII (Amended), section 1, there is no basis for concluding that the court lacks judicial power to hear public actions or cases that involve matters of public interest that might otherwise have been considered nonjusticiable under prior case law. Whether that analysis means that the state constitution imposes no such justiciability limitations on the exercise of judicial power in other cases, we leave for another day.

We also do not hold that moot cases will no longer be subject to dismissal. We hold only that Article VII (Amended), section 1, does not *require* dismissal in public actions or cases involving matters of public interest.

In a similar vein, we emphasize that, merely because there are no justiciability limitations on the exercise of judicial power in public actions or cases involving matters of public interest does not mean that the reference to "judicial power" in Article VII (Amended), section 1, is an empty vessel to be filled as it pleases the legislature. Separation of powers principles make clear that there are limits to what constitutes the "judicial power" that courts may exercise.

In *In re Ballot Title*, 247 Or 488, 431 P2d 1 (1967), for example, the legislature enacted a statute that required this court to "review" each and every ballot title, regardless of whether any party initiated a judicial proceeding to request such review. When asked to perform that automatic review, this court declined, explaining that the statute violated the separation of powers guarantee of Article III, section 1. The statute, the court said, required the court to provide advice to the legislature "without any form of judicial

process," when that advice "would not conclude or vindicate any right or remedy nor bind anyone at all." *Id.* at 491-92. That, the court said, is not the exercise of the judicial function. *Id.* at 493.

This case does not require us to define the boundaries of the judicial function. It suffices at this juncture to make the point that, even though such justiciability doctrines as mootness and standing are not implicit in Article VII (Amended), section 1—at least not in public action cases or those involving matters of public importance—there remain other limitations on the "judicial power" that may be exercised under the state constitution.

5.  *Application*

We turn to the question whether the legislature acted within its authority in enacting ORS 14.175. Under *Kellas*, the legislature's authority to enact legislation is "plenary, subject only to limitations that arise either from the Oregon Constitution or from a source of supreme federal law." 341 Or at 478. We are aware of no limitation on the legislature's authority to enact legislation authorizing litigants to maintain an action that, although otherwise moot, is capable of repetition, yet evading review. Such legislation purports to confer no more authority than what we have just concluded the courts possess under Article VII (Amended), section 1. As our analysis demonstrates, judicial determination of such cases is consistent with centuries of historical practice and the sound prudential exercise of judicial power, at least as to public action cases or cases involving matters of public interest.

This court's prior case law offers some aid in defining precisely what constitutes a "public action" case, or one involving a matter of "public interest." *Burnett*, for example, involved the validity of an order of a circuit court concerning the redemption of county-issued warrants. The court found the matter justiciable because the challenged order operated "in a very general manner upon the entire body of taxpayers of the county." 4 Or at 392. Similarly, *Ware* involved the validity of election notices, which the court referred to as a question "of public right" and "the enforcement of a public

duty." 13 Or at 383. *David* concerned the authority of a public body to issue bonds. The court declined to dismiss that case "in view of the public importance of the case." 14 Or at 125. And *Perry* involved the suspension of an individual's liquor license by the Oregon Liquor Control Commission, a question, the court said, that was "one involving the public welfare." 180 Or at 498-99.

This case does not require us to define the outer limits of what might constitute a "public action" or one involving issues of "public interest" for purposes of determining the authority of a court to decide an otherwise moot proceeding. Whatever those outer limits may be, it seems clear from the foregoing authorities that, at the least, such proceedings include those challenging the lawfulness of an action, policy, or practice of a public body, and such matters are precisely those to which ORS 14.175 applies. There is, in fact, no contention in this case that plaintiff's challenge to the constitutionality of the state election law does not amount to a challenge of an action, policy, or practice that is subject to review under that statute.

There remains the issue whether to exercise the authority provided under ORS 14.175. As we have noted, that statute provides that, in actions in which a party challenges the lawfulness of a public body's act, policy, or practice, a court "may issue a judgment on the validity of the challenged act, policy[,] or practice" even though the case may have become moot. The statute does not require a court to do so, but leaves it to the court to determine whether it is appropriate to adjudicate an otherwise moot case under the circumstances of each case. In this instance, the trial court did not reach that issue, having determined that the case was not the sort to which ORS 14.175 applies in the first place. We therefore remand the case to the circuit court to make that determination.

## II.   CONCLUSION

For the foregoing reasons, we hold that, although the trial court and the Court of Appeals did not err in concluding that plaintiff's claims are moot, they erred in

concluding that those claims are not justiciable under ORS 14.175.

The decision of the Court of Appeals and the judgment of the circuit court are reversed, and the case is remanded to the circuit court for further proceedings.